**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ALETA WILLIAMS,<br><br>                              Plaintiff,<br><br>   -against-<br><br>FAMILY HEALTH INTERNATIONAL d/b/a FHI 360,<br>TESSIE SAN MARTIN, and DEBORAH KENNEDY<br><br>                       Defendant. | Case No. |

Plaintiff ALETA WILLIAMS, by her attorneys, LPJ Legal PLLC, whose offices are located at 853 New Jersey Ave SE, Suite 200, Washington, DC 20003, and Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Aleta Williams ("Plaintiff"), an African-American, female resident of Washington, DC, brings this complaint to remedy discrimination against her in the terms and conditions of her employment because of her race, hostile work environment, and retaliation for her engagement in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII"); the 1866 Civil Rights Act, 42 U.S.C. § 1981 ("Section 1981"); violations of the District of Columbia's Human Rights Act, and equal pay violations on the basis of Plaintiff's gender in violation of the U.S. Equal Pay Act of 1963(the "EPA") .

**THE PARTIES**

2.      Plaintiff was subjected to racial discrimination, retaliation, and equal pay discrimination while employed at Family Health International, which operates under the tradename "FHI 360" ("Defendant FHI 360").

3.      At all relevant times, Plaintiff was Defendant FHI 360's "employee" within the meaning of applicable federal, state, and local laws, including Title VII, Section 1981, and the EPA.

4.      At all relevant times, Defendant FHI 360 was a domestic not-for-profit corporation with offices in Washington, DC. Defendant FHI 360's headquarters are located at 359 Blackwell Street, Suite 200, Durham, North Carolina 27701.

5.      At all relevant times, Defendant FHI 360 was Plaintiff's "employer" within the meaning of applicable federal, state, and local laws, including Title VII, 40 U.S.C. § 1981, and the Equal Pay Act of 1963.

6.      Defendant Tessie San Martin was the Chief Executive Officer ("CEO San Martin") of Defendant FHI 360. At all relevant times, CEO San Martin supervised Plaintiff's work.

7.      Defendant Deborah Kennedy was the Chief Operating Officer ("COO Kennedy") of Defendant FHI 360. At all relevant times, COO Kennedy supervised Plaintiff's work.

**JURISDICTION AND VENUE**

8.      This court has subject matter jurisdiction over Plaintiff's claims under Title VII, Section 1981, and the Equal Pay Act pursuant to 28 U.S.C. § 1331. This court has subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

2

9.      Venue is proper in the District of Columbia because pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 23, 2023, which she cross-filed with the District of Columbia Office of Human Rights.

11.     On June 26, 2024, the EEOC issued its Dismissal and Notice of Rights letter. Plaintiff files this Complaint fewer than 90 days after the EEOC issued its Dismissal and Notice of Rights letter.

## FACTUAL BACKGROUND

### Defendant FHI 360 Recruits Plaintiff

12.     Defendant FHI 360 is a non-profit human development organization that operates in more than 70 countries, including the United States. Its research and projects include a large and diverse global health portfolio (i.e. reproductive health, HIV/AIDS, nutrition, and infectious diseases such as malaria and tuberculosis) as well as education, economic development, gender, and civil society. Defendant FHI 360 has prioritized social and economic equity as part of its global commitment. Defendant FHI 360 works in concert with multi- and bi-lateral agencies, foundations, private sector, and academic and research institutions.

13.     Plaintiff has more than 25 years of experience working to unify public, private, and nonprofit visions to deliver high-impact, sustainable initiatives globally, working for international development agencies, in the public, nonprofit, and private sectors.

14. In or about March 2015, Defendant FHI 360's Chief Executive Officer, Patrick Fine ("CEO Fine"), contacted Plaintiff about an open position for a Director of Strategic Partnerships at Defendant FHI 360's Washington, DC location. Plaintiff and CEO Fine had worked together for 10 years at the U.S. Agency for International Development ("USAID"). CEO Fine was impressed by Plaintiff's abilities, dedication, drive, and achievements for USAID. CEO Fine specifically mention his admiration for Plaintiff's commitment to workforce diversity.

15. In or about March 2015, Defendant FHI 360 hired Plaintiff for the Director of Strategic Partnerships position. In this role, Plaintiff was responsible for engaging with the private sector and foundations to seek grants, contracts, and strategic alliances.

16. Initially, Plaintiff reported to an Indian woman, Manisha Bharti. When Ms. Bharti left the organization, Plaintiff started reporting to COO Kennedy, a white female.

17. As Director of Strategic Partnerships, Plaintiff regularly interacted with several white females on Defendant FHI 360's executive team, including Principal Economist and Strategy Director Annette Brown ("Director Brown"), and Human Resources Director Pam Myers ("HR Director Myers"). Later in her tenure with Defendant FHI 360, Plaintiff regularly interacted with Communications Director Christine Bragale ("Director Bragale").

### Defendant FHI 360 Promotes Plaintiff

18. In or about the Summer of 2015, Defendant FHI 360 went through a reorganization. As part of this reorganization, Defendant FHI 360 promoted Plaintiff to Director for Business Development and Diversification. This new role included her Strategic Partnerships role and added all business development globally for Defendant FHI 360.

19. As the Director for Business Development and Diversification, Plaintiff was one of three people with delegated authority to negotiate and sign contracts on behalf of Defendant

4

FHI 360. She created, integrated, and oversaw the entire global business development apparatus, which included the pursuit and winning of competitive bids with bilateral, multilateral, private sector, and foundation clients. She led the sale target-setting process and overarching business development strategy and vision. She managed a team of 45+ staff across Asia, Africa, and the United States, including analysts, proposal professionals, writers/editors, and strategic partnerships experts, as well as a cohort of consultants. The job also entailed high-level, external engagement with traditional and non-traditional clients.

20.    Plaintiff excelled in her new role and achieved several individual and company milestones. For example, Plaintiff created and implemented a customized, highly effective business development model for Defendant FHI 360. In addition, Plaintiff led the company through several initiatives which garnered them in unprecedented $6.29 billion in sales over eight and a half years, including several years of sales in excess of $1 billion. These were firsts for the organization.

21.    Plaintiff transformed her team from one of low morale and a high attrition rate to a top-performing team with the lowest attrition rate in the organization, and which started winning corporate awards for their game-changing work. Because of her efforts, Plaintiff regularly received positive feedback from COO Kennedy and CEO Fine.

**CEO Fine Promotes and Encourages Leadership Roles for a Diverse Workforce**

22.    When Defendant FHI 360 hired Plaintiff, it had never had a single Black employee on the executive team. CEO Fine created two leadership teams to increase the exposure of people of color to the executive team: the Subsidiary Leadership Team and the Executive Leadership Forum. The Subsidiary Leadership Team sat just below the executive team of Defendant FHI 360, was a very diverse group, and was viewed as a talent pipeline for the

executive team. The Executive Leadership Forum, by contrast, had only three Black employees out of about 20 members. Defendant FHI 360, under a new CEO, dismantled the subsidiary structure in 2021, thereby ending this more diverse leadership structure and talent pipeline.

23.     Recognizing that a lack of diversity is a problem, CEO Fine encouraged Plaintiff to improve Defendant FHI 360's hiring process to ensure that it had a diverse pool of candidates applying and interviewing for job openings, and that it hired and retained diverse employees. Plaintiff was pleased by CEO Fine's awareness of the problem and resolved to work on creating and promoting a diverse workforce for Defendant FHI 360.

24.     CEO Fine set the tone for Defendant FHI 360, confronting institutional racism and unconscious bias by, among other things, discussing Diversity, Equity & Inclusion ("DEI") openly and directly in leadership meetings. He encouraged including a candidate's commitment to DEI as a factor for hiring decisions. CEO Fine also instituted the DEI Initiative at Defendant FHI 360 to address racial disparities within the organization in a deliberate and purposeful manner.

25.     In 2015, shortly after hiring Plaintiff, CEO Fine instituted a company requirement for all employees in leadership positions to participate in 16 hours of "impact vs. intent" diversity training to gain a common understanding of why a person's intent with respect to offensive statements and actions is irrelevant because it causes harm to another. The training demonstrated why, even if the person did not mean to cause harm, it is important to focus on the impact of the statements or actions to foster good interpersonal relationships in a diverse workforce. In particular, if people are shielded from accountability because they did not intend any harm, the offending people never learn that their words or actions caused harm, and the target has no redress for a real harm they suffered.

6

**CEO Fine Retires, Leaving Leadership Gap for DEI Issues**

26.     Typically, when Defendant FHI 360 created an initiative, it treated the initiative as a high priority. The initiative is implemented with a top-down focus, spearheaded by a senior leader who directed the initiative's strategy, timelines, and deliverables. Equally, Defendant FHI 360 allocated company resources to the initiative and to implementing changes recommended by research reports coming out of the initiative's work. This is how Defendant FHI 360 approached the DEI Initiative under CEO Fine's leadership.

27.     Defendant FHI 360 appointed two white women – COO Kennedy and HR Manager Myers – as the executive sponsors of the DEI Initiative. In response to internal reaction, Defendant FHI 360 added two Black male leaders – Otto Chabikuli and Ricardo Michel ("Leaders Chabikuli and Michel").

28.     The DEI Initiative proceeded along the expected course during CEO Fine's tenure.

29.     CEO Fine announced his retirement in early 2021, and COO Kennedy acted as interim CEO until September 2021, when Defendant FHI 360 hired CEO San Martin as CEO. Under COO Kennedy's and CEO San Martin's leadership, Defendant FHI 360's commitment to the DEI Initiative and DEI, in general, changed abruptly. Both undermined the goals of the DEI Initiative and Defendant FHI 360's commitment to addressing DEI issues in a meaningful way. Leaders Chabikuli and Michel expressed frustration with COO Kennedy's and HR Manager Myers' seeming disinterest in improving DEI at Defendant FHI 360.

30.     For example, in or about Spring 2021, Defendant FHI 360 researcher Dr. Allysha Maragh-Bass started a self-directed working group at the organization focused on diversity, equity, and inclusion, decolonization, and localization. The work was fueled, in part, by the

7

working group's personal and professional interests, but also the growing demands of Defendant FHI 360's main donor, USAID, and private foundations.

31. The working group developed information concerning racial disparities within the organization and the international development industry. The work was viewed as so important that USAID awarded an unsolicited grant to Dr. Maragh-Bass to develop a white paper on the group's work.

32. Once CEO Fine left the organization, COO Kennedy questioned the working group's purpose and its engagement with USAID, discouraged discussions of decolonization, and even questioned the grant USAID awarded to Dr. Maragh-Bass. Communications Director Bragale made disparaging remarks about Dr. Maragh-Bass, openly bragging that she made grammatical corrections to Dr. Maragh-Bass' slide decks for presentations to suggest that Dr. Maragh-Bass was ignorant or inarticulate. Director Brown openly questioned Dr. Maragh-Bass's credentials as a researcher, stating that she did not have the international experience necessary for FHI 360's work.

33. After CEO Fine's departure, COO Kennedy and HR Director Myers implemented a bottom-up focus for the DEI Initiative. Instead of spearheading the DEI Initiative, they decentralized the DEI Initiative's strategy and process for gathering information by creating small, staff-led councils to collect information. They did not, however, set standards for data collection and delivery to Defendant FHI 360 senior leadership. Further, they failed to empower the staff-led councils to make changes locally in response to what they learned in the course of their fact-finding.

34. Simply, COO Kennedy and HR Director Myers were not comfortable talking about race. They were not comfortable with race as a component, or the main component, of the

8

DEI Initiative. Defendant FHI 360 is known for its work promoting gender equity, but its work primarily benefitted white women. Nevertheless, the executive sponsors of the DEI Initiative avoided a focus on race – and even rejected a focus on race – even though the DEI Initiative was started to improve racial disparities within the organization.

35. COO Kennedy undermined the DEI Initiative during the first global staff meeting after she was appointed as executive sponsor. She stated that she "finds it hard to believe that bullying and harassment take place at [Defendant FHI 360] because [they] have good managers." She also asserted that the DEI Initiative was not "about race only."

36. Plaintiff was surprised by COO Kennedy's statements because the DEI Initiative was started specifically to be about race. At the meeting, Michelle Gillard, a Black woman, challenged COO Kennedy's assertions. Instead of correcting herself, COO Kennedy doubled down and repeated her statements. Ms. Gillard has since left the organization, vowing never to consider returning.

37. A few days later, COO Kennedy tried to retract and correct her statements via email. The email was not sent all attendees of the global staff meeting. Rather, COO Kennedy sent the email to a few attendees, including Plaintiff. In the email, she admits that she has "blind spots," but if people experienced bullying or harassment, they should report it.

**Defendant FHI 360 Increases Plaintiff's
Job Duties and Her Pay Dips Below Market**

38. On or about June 2020, Defendant FHI 360 acquired a firm based in the United Kingdom, a transaction in which Plaintiff was instrumental. As result of the acquisition, Plaintiff's role changed significantly. In addition to her duties as Director of Business Development and Diversification, Defendant FHI 360 assigned her the duties of acting

Managing Director for the UK entity. Plaintiff was also tasked with assisting with the acquisition and post-acquisition integration.

39.     Given her increased responsibility, Plaintiff hired an external executive compensation consultant, who advised Plaintiff that the market rate for the acting Managing Director role was a 10% increase in compensation. An FHI360 HR representative told Plaintiff that a 10% increase was not outside the norm for a "normal acting" role, but that anything over a certain threshold had to be approved by HR Manager Myers. The most HR Manager Myers would offer Plaintiff, however, was a 5% increase.

40.     Armed with competitive intelligence from the compensation consultant, Plaintiff contacted Defendant FHI 360 human resources and requested a 10% salary increase. Defendant FHI 360 refused. After additional negotiation, Defendant FHI 360 approved a 5% salary increase and agreed to hire an executive coach for Plaintiff to help her work "smarter, not harder." Despite the small increase, Plaintiff's salary remained below market value for her new role and responsibilities. Plaintiff was extremely disappointed by the minimal raise, but fulfilled her role as acting Managing Director diligently and successfully.

41.     Adding insult to injury, when Plaintiff's acting role ceased, her salary was decreased to the business development director range. Upon information and belief, FHI 360 does not consistently decrease employees' salaries after they complete acting roles.

42.     Upon information and belief, Defendant FHI 360 does not pay similarly situated male and/or non-Black employees at rates below market, nor does Defendant FHI 360 assign male and/or non-Black employees additional duties in an interim role, and then reduce the pay of male or non-Black employees when their responsibilities for an interim role cease.

**Defendant FHI 360 Hires CEO Tessie San Martin**

43.     In or about September 2021, Defendant FHI 360 hired Tessie San Martin ("CEO San Martin") as CEO Fine's replacement. CEO San Martin self-identifies as Cuban-American and "white-passing," meaning that although she is Cuban, she is light-skinned and can pass as white. Upon information and belief, CEO San Martin had no experience running an organization with the size, global reach, and budget of Defendant FHI 360.

44.     CEO San Martin did not take the time to get to know her whole team when she came to work for Defendant FHI 360. Instead, she met with and got to know a select few of her direct reports, and allowed them to influence her opinions of other leaders. She made no effort to know Plaintiff's experience and abilities until after Plaintiff raised the specter of a discrimination claim.

45.     Plaintiff observed that CEO San Martin did not understand that she set the tone for Defendant FHI 360 and that only what she considered important would be prioritized by the organization. For example, CEO San Martin said that DEI was important, but she refused to demonstrate its importance by following through on her policy statements. She declared that DEI would be discussed at every Executive Leadership Forum meeting, but it was only ever an occasional agenda item.

**DEI Initiative Sponsor Reveals Executive Team Tone-Deafness**

46.     On or about September 30, 2021, on her first day as chief executive officer, CEO San Martin conducted a meeting (the "Global Interview") that was open for all staff to attend.

47.     As part of the Global Interview, COO Kennedy interviewed CEO San Martin and asked a question about the "Black experience." CEO San Martin responded that she did not understand the question, and COO Kennedy rephrased it.

48.     Even after COO Kennedy rephrased the question, CEO San Martin clearly did not want to answer it. She curtly responded, "Oh, I see." An awkward silence fell over the meeting and COO Kennedy change the subject.

49.     CEO San Martin's refusal to respond to a question regarding the "Black experience" immediately raised eyebrows among Defendant FHI 360's Black employees, including Plaintiff. It showed that CEO San Martin was unwilling to learn from or understand Defendant FHI 360's Black employees. More troubling, it showed that COO Kennedy – an executive sponsor of the DEI Initiative — thought it useful or appropriate to ask a white-passing Cuban-American to expound on the "Black experience."

50.     Under CEO San Martin, oversight of the DEI Initiative was outsourced to an external consulting firm. Without strong backing from Defendant FHI 360's leadership, the consulting firm struggled to get staff to show up to meetings, failed to develop any meaningful recommendations, and did not feel empowered to act on its findings.

### CEO Makes Staffing Changes to Move White or White-Passing Individuals Into Leadership Roles

51.     When Plaintiff joined Defendant FHI 360, the organization included several subsidiaries whose management teams were included in Defendant FHI 360's leadership forum. Diverse and talented employees strived to work in management at the subsidiaries because they perceived the subsidiaries to be a pipeline for promotion into Defendant FHI 360's executive-level teams. When CEO San Martin started working at Defendant FHI 360, the Managing Directors of several subsidiaries were diverse and included people of color.

52.     Almost immediately, CEO San Martin systematically dismantled all but three subsidiaries. She demoted Asian and Black employees from their management positions in the subsidiaries to non-management or less prominent positions within Defendant FHI 360, thereby

reducing their visibility and contact with Defendant FHI 360's executive team and board of directors.

53.    At two of the three remaining subsidiaries, CEO San Martin replaced Black leaders with white or white-passing candidates. At one subsidiary, the Black, male leader was replaced with a white-passing Latino internal candidate who never applied for the job. At another, Defendant FHI 360 asked a female Black leader to step down, then replaced her with a white male. The sole subsidiary that CEO San Martin did not change, FHI 360 Clinical, has a white male Director. The subsidiary is not performing well and has lost money while having to layoff staff. Despite the obvious need for revamping, CEO San Martin determined that FHI 360 Clinical will remain independent.

### CEO San Martin Mischaracterizes, Embarrasses, and Undermines Plaintiff's Contributions to Meetings

54.    On or about October 13, 2021, during a team videoconference, CEO San Martin accused Plaintiff of calling Defendant FHI 360's DEI Initiative a failure. Plaintiff was confused by CEO San Martin's accusation because she had not made any such statements to CEO San Martin.

55.    Plaintiff corrected CEO San Martin, who became defensive and argumentative, angrily insisting that Plaintiff made the comment.

56.    Paula Pazderka ("Colleague Pazderka"), the white colleague who actually stated that the DEI Initiative was a failure, acknowledged in the meeting chat that she made the statement. CEO San Martin ignored Colleague Pazderka's message: it conflicted with CEO San Martin's impression of Plaintiff as an "Angry Black Woman." CEO San Martin certainly did not apologize to Plaintiff for her mistaken accusation.

57.     Plaintiff was extremely upset with how CEO San Martin demeaned, undermined, and argued with her as though she were the aggressor in the situation. Plaintiff began to notice that CEO San Martin did not demean or argue with Plaintiff's non-Black colleagues.

58.     In Plaintiff's experience, CEO Martin worked more amicably with white male employees than with Black women. Apparently, CEO San Martin subscribed to the stereotype of the "Angry Black Woman," and it affected her employment-related decision-making. CEO San Martin's embracing of the "Angry Black Female" stereotype meant she could dismiss the employment-related concerns of Black women, including Plaintiff, as manifestations of their anger rather than explicit or implicit bias.

59.     Plaintiff did provide some feedback concerning the DEI Initiative, at CEO San Martin's request. As part of COO Kennedy's 360-degree review, CEO San Martin asked Plaintiff feedback on COO Kennedy's work on the DEI Initiative. Plaintiff was less than laudatory, telling CEO San Martin:

> Given [COO Kennedy's] seat on the [Executive Team], DEI executive committee and overall influence in the organization (given most of our business sits under her), she is uniquely positioned to advance key priorities around DEI. While I note that [COO Kennedy] has been very proactive in participating in outside trainings, independent readings and very engaged in our internal efforts, there have been observations made that her comments on "not about race only" failed to acknowledge that our DEI effort started as a response to systemic racism and racial injustice in the US. It reinforces the perception that Black employees have that the organization, and its leadership is more concerned and sensitive to anything other than race (gender, LGBTQ, disability).

60.     CEO San Martin responded that Plaintiff's comment was not inconsistent with feedback she received from others. Nevertheless, CEO San Martin did nothing to address the negative perceptions of Black employees. Instead, she challenged the reliability of Black employees' perceptions.

**Plaintiff Complains To Human Resources About CEO San Martin**

61.    Plaintiff complained about CEO San Martin's discrimination to Defendant FHI 360's Human Resources Department on several occasions.

62.    In particular, Plaintiff spoke with Dawn Fisher ("Colleague Fisher"), a Black woman who was responsible for handling internal complaints about discrimination. Fisher confronted CEO San Martin about her harmful interactions with Black staff, stating that Black employees did not trust CEO San Martin because of negative statements CEO San Martin made about Black people and the manner in which CEO San Martin interacted with Black employees.

63.    For example, CEO San Martin committed to meeting with the African American Employee Resource Group ("ERG"), but canceled the meeting. CEO San Martin indicated it would be months before she would be available to participate in another African American ERG meeting. After Plaintiff pointed out that CEO San Martin made time for other ERGs (i.e., LGBTQI, Young Professionals, etc.), CEO San Martin reinstated the meeting with the African American ERG.

64.    Plaintiff spoke with Colleague Fisher to note her concerns and get Colleague Fisher's advice. She also spoke with Colleague Fisher to determine if there were any efforts underway to address the concerns and experiences of Black staff of which Plaintiff was not aware. Colleague Fisher confirmed that there were no new efforts, and did not seem optimistic that anything was going to change.

65.    Upon information and belief Defendant FHI 360 did not investigate Plaintiff's complaints.

**CEO San Martin Demotes Plaintiff In Retaliation For Her Complaints**

66.     On or about November 24, 2021, in retaliation for complaining to Human Resources, CEO San Martin asked Plaintiff to step down as the acting UK Managing Director and to focus on the Business Development and Diversification role. CEO San Martin explained, passive-aggressively, that Plaintiff's Business Development and Diversification role was a "big job," and that Plaintiff needed to be "set up for success." Even though Plaintiff's actions brought in billions of dollars to the organization, CEO San Martin implied that Plaintiff was not successful in her business development role and needed to focus her efforts on business development.

67.     Shortly after their conversation, Plaintiff suspected that CEO San Martin intended to hand the UK Managing Director role to a white male colleague, Steve Brady ("Employee Brady"). Plaintiff also noticed that CEO San Martin responded more favorably to Employee Brady and readily accepted his ideas and suggestions. In contrast, CEO San Martin frequently brushed off Plaintiff's recommendations or ignored her suggestions concerning the UK Managing Director work.

68.     Because of CEO San Martin's positive responses to Employee Brady, Plaintiff advised the UK leadership team, including Employee Brady, that Employee Brady should take a more forward-facing role with CEO San Martin. The leadership team agreed. The same suggestions were rejected when Plaintiff promoted them, and accepted when Employee Brady promoted them.

69.     Plaintiff hired Employee Brady and, as his manager, was familiar with his strengths and weaknesses. One particular challenge was Employee Brady's lack of experience managing a for-profit entity like the UK entity, and failure to demonstrate proactive, hands-on

16

leadership for pursuing opportunities and building the business. Accordingly, Plaintiff recommended an Indian-British woman to fill the UK Managing Director role despite CEO San Martin's marked preference for Employee Brady. Plaintiff's candidate had significantly higher qualifications than Employee Brady. CEO San Martin was not interested in the more qualified candidate and refused to interview her. Instead, CEO San Martin decided to make Employee Brady the "acting" Managing Director until she had a better sense of what she was going to do with the UK entity.

70. Upon information and belief, CEO San Martin suggested this role change as a way to marginalize Plaintiff in the organization. CEO San Martin resolved to demote Plaintiff and her work within Defendant FHI 360, just as she had done with the diverse leaders she demoted when she organized the subsidiaries.

71. Moreover, the role change demonstrated CEO San Martin's discriminatory attitude towards Black women. The comparison is stark. CEO San Martin believed that Plaintiff, who won billions of dollars in grants and donations for the organization, needed support and had to relinquish part of her job to a white male to be "successful." In contrast, CEO San Martin did not believe the white male needed any support in the role despite his having inadequate experience for the role.

72. CEO San Martin eventually installed Employee Brady as the UK Managing Director, despite Plaintiff's concerns about his lack of experience. Indeed, she installed Employee Brady even though a Libyan-British woman filed a complaint against him concerning race and ethnicity discrimination. Unlike Plaintiff, Employee Brady has not grown the UK business or achieved any other meaningful results as UK Managing Director.

17

**Defendant FHI 360 Fails To Enact DEI Initiative Recommendations**

73.    In or about December 2021, Defendant FHI 360 hired an external commission (the "Commission") to support the DEI Initiative. The Commission sent out a survey to Defendant FHI 360's employees to gather information about diversity in Defendant FHI 360's workforce and measure the success of the DEI Initiative. In early 2022, the Commission analyzed the results of the surveys and released their analysis in a report to Defendant FHI 360.

74.    The commission's DEI survey and analysis specifically flagged that Defendant FHI 360's workplace perpetuated a culture of marginalization and bullying of Black employees. Black employees reported a high turnover rate, salary concerns, promotion bias, and frequent microaggressions from leaders and colleagues. The analysis specifically concluded not only that Black women were at risk within Defendant FHI 360's organization, but they were experiencing trauma from the working conditions.

75.    Defendant FHI 360 did not make any changes to its policies or take action to work with its executive leadership team to address the company culture of bullying and repression toward Black employees in general, and Black women in particular. If anything, the marginalization of Black Women and Black employees only became worse.

**CEO San Martin Ignores Plaintiff's**
**Pleas To Promote A Diverse Workforce and Only Considers White Candidates**

76.    In or about April 2022, CEO San Martin began the search for a new Chief of Staff who would report to her. She sought Plaintiff's advice about the hiring process. Plaintiff suggested that Defendant FHI 360 outsource recruitment for the position to get a diverse pool of candidates. CEO San Martin ignored Plaintiff's recommendation and only interviewed white people for the role. CEO San Martin selected a white male for the position.

18

77.     Unlike Defendant FHI 360's usual process for new hires, Defendant FHI 360's human resources department did not vet CEO San Martin's selection. Plaintiff and several leaders reviewed the candidate's social media accounts and found alarming content. Along with racist posts, they found anti-LGBTQI affiliations, anti-science posts (Defendant FHI 360's tagline is "the science of improving lives"), posts that reflected favorably upon far right politicians like Vladimir Putin and Marine LePen, and anti-Ukraine posts. They informed CEO San Martin and Defendant FHI 360 about the candidate's social media presence, but CEO San Martin brushed off their concerns, citing the candidate's "diversity of thought."

78.     Plaintiff expressed her disagreement with hiring the candidate and gave an impassioned appeal against it. Plaintiff noted that "diversity of thought," in the current political and highly polarized environment, was a "threat to many [Black people's] freedoms." The candidate's "diversity of thought" was weaponized against marginalized people. Plaintiff asked her colleagues to consider how they would feel if they reported to an all-Black or all-male executive team, and that homogenous team was justified as representing "diversity of thought" instead of actual diversity.

79.     Plaintiff expressed her biggest frustration with Defendant FHI 360's apparent indifference to racial diversity: Defendant FHI 360 had a framework for, and the ability to, respond to gender, disability, and LGBTQ+ issues in the workforce, but continued to be reluctant to apply that framework to racial disparities within the organization.

80.     After Plaintiff's questions and pleas, the room fell into an awkward silence. Not one person spoke in support of Plaintiff's comments at the meeting. Nevertheless, the organization-wide push back against the candidate was immediate and widespread, and

Defendant FHI 360 asked the candidate to withdraw his acceptance of the offer. Upon information and belief, he was compensated to do so.

**Director Bragale Utilizes the "Angry Black Woman"**
**Stereotype to Dismiss and Diminish Plaintiff**

81.    In or about June 2022, Director Bragale asked Plaintiff to take on a large project that required a substantial time commitment from her team. Plaintiff and her direct report Director Andy Turner ("Director Turner"), a white female, discussed the project and determined that Plaintiff's team would not be able to prioritize the project along with its other duties and assignments.

82.    Both Plaintiff and Director Turner responded to Director Bragale that they were unable to take on the project because of the team's existing priorities.

83.    On or about July 11, 2022, during a leaders meeting, Director Bragale and another white colleague on her team, Rachael Morgan ("Employee Morgan"), discussed Plaintiff's inability to take on the project. Director Bragale and Employee Morgan falsely stated that Plaintiff was "angry" and "bitter" about their request. Moreover, Director Bragale attempted to co-opt a Black female subordinate to co-sign onto this description of Plaintiff. The subordinate refused and has since left Defendant FHI 360.

84.    Plaintiff was frustrated, upset, and offended by being labeled as the "Angry Black Woman," again. She spoke with Director Turner about the racial stereotyping. Director Turner was alarmed by the characterization. She, too, had pushed back on the project and was not called "angry" and "bitter" for it. Director Turner agreed with Plaintiff that it was wrong for Director Bragale to embarrass and mischaracterize Plaintiff in that public forum.

85.    Plaintiff reported Director Bragale's statements to Defendant FHI 360's human resources and CEO San Martin. CEO San Martin admitted having received similar complaints

20

about Director Bragale from others, yet she did nothing to affect positive behavioral change in Director Bragale.

**Plaintiff Complains About Defendant**
**FHI 360's Lack of Support for Black Employees**

86.     During a July 2022 Expanded Leadership Forum meeting, CEO San Martin started a discussion about psychological safety in the workplace. She stated that Defendant FHI 360 leaders should "assume good intent and be kind." COO Kennedy and Director Bragale enthusiastically agreed with CEO San Martin's statement.

87.     Plaintiff was extremely disappointed in the underlying message-that employees complaining of disparate treatment on the basis of race are wrong to assume that the disparate treatment had anything to do with race discrimination because FHI 360 leaders "meant well." Taken to its logical conclusion, the assumption that everyone meant well necessarily meant that anyone concerned about implicit or explicit bias was not kind and did not assume good intent. In short, they were troublemakers rather than victims of disparate treatment.

88.     CEO San Martin gave the example of when a manager, Leila Abu-Gheida, "gently pushed back" on an issue with her, to illustrate that it is important to challenge one another. Colleague Pazderka challenged CEO San Martin's example, stating that not everyone feels comfortable or welcome to push back against their colleagues or superiors. Plaintiff, knowing that Leila Abu-Gheida had several complaints against her for bullying, spoke up in support of Colleague Pazderka's statements and reminded leadership of the elementary concept that not everyone is extended the same grace when they push back.

89.     Moreover, Plaintiff reminded CEO San Martin that Defendant FHI 360 labeled Black employees who pushed back as "disagreeable" or "angry" when they challenged

21

colleagues or superiors-something that CEO San Martin and the Expanded Leadership Forum knew or should have known and been well aware of.

90.     Finally, Plaintiff took exception to the notion that one should "assume good intent" and reminded CEO San Martin that a person can cause harm to another (an impact) regardless of their intent. To ignore the impact of one's statement and actions is harmful to both the offending person and the target because it prevents the offending person from ever learning or taking responsibility for their actions, and ignores the harm done to the target.

91.     Plaintiff was appalled by CEO San Martin's instruction to "assume good intent" because it was the opposite of what Defendant FHI 360 leaders learned in their 16 hours of "impact versus intent" training under CEO Fine. The "impact versus intent" training urged white employees to gracefully accept criticism where they gave offense and to strive to do better. It encouraged Black employees to trust that their white colleagues would accept criticism without judgment or retaliation. "Assuming good intent," however, reinforced old ways of thinking, where white people could inflict offense blamelessly and Black people were encouraged to endure it or risk being labeled as "overly sensitive" or a "troublemaker."

92.     Plaintiff recommended psychological safety training for the leadership team, which she required of her managers. However, CEO San Martin ignored Plaintiff's comments and brushed-off her recommendation. She, instead, doubled down, insisting that intent is more important than impact.

93.     CEO San Martin wanted the appearance of addressing DEI in the workplace without the bother of identifying inequity or making actual institutional change. When a group of international development organizations formed the Coalition for Racial & Ethnic Equity in Development and developed the pledge for Racial and Ethnic Equity, CEO San Martin was

reluctant to sign the pledge. It took a fair amount of convincing before Defendant FHI 360 would formally pledge to address systemic racism, institutional discrimination, western white centeredness, and white privilege in the international development and humanitarian assistance sector.

### Plaintiff Hires Counsel

94. One or about July 15, 2022, Goddard Law PLLC sent a Letter of Representation to Defendant FHI 360, informing it that Plaintiff hired the firm to represent her regarding discrimination at the company. Plaintiff did not take this step lightly, but the years of being marginalized, brushed-off, underpaid, and being characterized as an "Angry Black Woman" had taken their toll.

95. Plaintiff's complaint spurred defensiveness among Defendant FHI 360's leaders. Instead of addressing the root cause of Plaintiff's complaint HR Director Myers decreed that Defendant FHI 360 should avoid firing Black women, for fear they would all hire lawyers.

### Defendant FHI 360 Human Resources' Belief that "Microaggressions" Only Exist in the Imagination of Oversensitive Black Women

96. In late July 2022, Plaintiff learned about a Human Resources document that was prepared either at the same time as, or shortly after, Defendant FHI received Goddard Law PLLC's Letter of Representation. The document is a presentation concerning voluntary attrition at Defendant FHI 360 for the previous four quarters (the "Attrition Presentation") The Attrition Presentation addresses DEI by stating, "we need to find a common understanding of where the line is between micro-aggression and oversensitivity."

97. This "common understanding" asks for a bright line beyond which Black people are not entitled to feel offended, and anyone who is offended can be disregarded as "oversensitive." This, again, runs counter to the 16 hours of "impact versus intent" training

Defendant FHI's leaders received under CEO Fine. It effectively absolves white people from doing the work of acknowledging their biases to improve fairness and equity in the workplace.

98.    Plaintiff was appalled by this. She asked how Black women are to thrive at Defendant FHI 360 if its leaders believe that microaggressions and oversensitivity are next-door neighbors existing on a single continuum. She asked how Black women can be expected to thrive at Defendant FHI 360 when reporting microaggressive behaviors or racism is futile because they will be dismissed as ravings of the oversensitive. She asked how Black women can thrive when they cannot trust that Defendant FHI 360 has any interest in making necessary changes to ameliorate microaggressions and racism.

99.    CEO San Martin again replied that Black women should assume good intent on behalf of the offending people, shifting the onus back onto Black women to determine whether they are being oversensitive or they are entitled to feel offended. Then, it forces Black women to risk being labeled "not kind" if they do not "assume good intent" and report the offensive conduct.

100.    Plaintiff replied that assuming good intent does not provide the victim the opportunity to correct the offending person so that the person might recognize the problem with their actions, acknowledge and understand the wrong, or do better in the future. By forcing Black employees to assume good intent, the onus remains on the Black employee, as target of the microaggression, to experience the trauma of racism without the possibility for acknowledgement that the trauma occurred.

101.    CEO San Martin refused to recognize that requiring Black employees to assume intent effectively gaslights Black employees. She refused to acknowledge that telling Black employees that they work in a harassment-free workplace because Defendant FHI 360 has an

anti-harassment policy is nothing more than gaslighting because, despite the alleged policy against discrimination, Black employees are forced to endure racial harassment and microaggressions while the offending non-Black employees get to believe that everything is fine, thereby preventing the Black employees from enjoying the harassment-free workplace that non-Black employees enjoy.

102.    Equally startling are the revelations contained within the Attrition Presentation. It states, "Turnover highest among African Americans at 23% and they make up 19% of active employees. Most African Americans who left were female and age 30-39." It continues, "50% of African Americans disagree their supervisor actively demonstrated his/her commitment to DEI."

103.    Despite this stark contrast between its Black and white employees, Defendant FHI boasted, "According to the survey, most supervisors demonstrate a commitment to DEI." The Attrition Presentation shows that white employees comprised 60% of turnover during the relevant period. It is not surprising that those who are least affected by racial inequity would view Defendant FHI 360's commitment to DEI favorably.

### CEO San Martin and COO Kennedy Retaliate Against Plaintiff

104.    In or about August 2022, shortly after Plaintiff complained about microaggressions against Black employees at the July team meeting and Goddard Law PLLC sent Defendant FHI 360 the Letter of Representation, CEO San Martin and COO Kennedy dramatically changed how they interacted with Plaintiff.

105.    CEO San Martin started avoiding Plaintiff. She frequently cancelled their bi-monthly check-ins to avoid speaking with Plaintiff. CEO San Martin also decided to overhaul aspects of Plaintiff's work, despite not having previously reviewed or participated in the work.

106.    COO Kennedy also reduced her interactions with Plaintiff. She only interacted with Plaintiff on a superficial level to maintain the appearance that she was keeping Plaintiff

25

informed regarding Plaintiff's team. COO Kennedy purposefully walled-off Plaintiff from significant decisions relating to her team. Specifically, COO Kennedy continued her standing bi-monthly meetings with Plaintiff, but excluded Plaintiff from other key meetings. COO Kennedy started shifting business development employees away from Plaintiff's reporting line to regional offices, and started approving the hiring business development employees in business units and regional offices without involving Plaintiff.

107.    In February 2022, when Russia invaded Ukraine, COO Kennedy excluded Plaintiff from a meeting when Defendant FHI 360 leaders made key decisions concerning a business opportunity in Russia. Plaintiff decided not to pursue the business opportunity because it could undermine Defendant FHI 360's reputation with USAID, one of Defendant FHI 360's major clients. At the meeting, CEO San Martin overrode Plaintiff's decision, effectively undermining Plaintiff's judgment.

108.    In or about September 2022, Defendant FHI 360 hired consultants Accenture Development Partners to analyze operational issues and make recommendations to improve Defendant FHI 360's agility and effectiveness. This had significant implications for business development, so CEO San Martin assigned Plaintiff to work on a steering committee with Accenture Development Partners.

109.    Soon thereafter, CEO San Martin inexplicably removed Plaintiff from the steering committee, as a result of which Plaintiff no longer played a role in setting priorities for business development. Instead, Plaintiff was replaced by a white male colleague and white female colleague, both of whom were recommended by COO Kennedy. Upon information and belief CEO San Martin removed Plaintiff from the steering committee in retaliation for her vocal

opposition to Defendant FHI 360's policies concerning DEI, as well as her advocacy for herself and other Black employees.

## Defendant FHI 360 Exploits and Underpays Black Women

110. In or about Spring 2022, a white colleague ("Colleague Doe") selected a white woman for an open position in her department. The white woman had less experience than the existing Black employees in her department who were working in the same role. Defendant FHI 360 offered a much higher salary to the new, white employee than what Defendant FHI 360 was paying the existing Black employees for the same role.

111. Colleague Doe complained to Defendant FHI 360 about the pay inequity and requested that Defendant FHI 360 increase the salary of the existing Black employees to match the salary of the prospective white employee. Defendant FHI 360 refused to do so. Eventually, Colleague Doe convinced Defendant FHI 360 to offer the new white employee less money while giving a modest raise to the existing Black employees to fix the pay inequity.

112. Plaintiff was well-aware of the pay disparity between Black and non-Black employees. The work environment at Defendant FHI 360 was fraught for Black employees, and Plaintiff found herself acting as therapist and guide to many Black employees. Two Black women, for example, sought Plaintiff's advice concerning pay inequity. Plaintiff counseled them and helped one get promoted and both to renegotiate their pay.

## Defendant FHI 360 Experiences High Turnover for Black Employees

113. In or about October 2022, Defendant FHI 360 released a quarterly report on its turnover rates, which highlighted unfavorable facts about the executive leaders. The report noted a pervasive attitude that perpetuated microaggressions and the impression that Black employees who push back or call-out these microaggressions were "over-sensitive."

114.     The report also showed that Black employees in general, and Black women in particular, repeatedly complained in their exit interviews about inequity in pay, bias in promotions, and a culture replete with microaggressions at Defendant FHI 360. Following this report, Director Bragale joined the exit interview of a Black woman and harangued her until she stated that Defendant FHI 360 did not discriminate against her.

115.     Despite the repeated direct complaints from Black employees, Defendant FHI 360 refused to address the culture of racism and harassment at Defendant FHI 360, or make the pay rates for Black employees – especially Black women – equitable with their non-Black co-workers in substantially equal.

## Faced With Imminent Discrimination Claims, Defendant FHI 360 Changes Some Policies

116.     After Goddard Law PLLC sent its Letter of Representation, CEO San Martin invited Plaintiff to lunch or dinner. For the first time, CEO San Martin saw fit to make an effort to get to know Plaintiff instead of relying upon the opinions of others.

117.     COO Kennedy finally decided to include Plaintiff in decision-making relating to business development budgets for bids worked on by business units and regional officers. Plaintiff's predecessor managed the budget completely, but COO Kennedy only recently delegated to Plaintiff the authority to approve requests over a certain threshold.

## Plaintiff's Employment is Constructively Terminated

118.     The years of being gaslighted, bullied, and marginalized at Defendant FHI 360 had taken its toll on Plaintiff. In her performance evaluation in 2022, Plaintiff reported to COO Kennedy that she never, in her 30+ years of professional work, needed to see a therapist for the extreme emotional toll of a job, before Defendant FHI 360. COO Kennedy remarked favorably upon Plaintiff's creation of a psychologically safe space for her team, and recognizing and

28

championing her team and their achievements. Plaintiff replied that she gave her team everything she did not get from Defendant FHI 360.

119.    Defendant FHI 360 made a show of implementing a DEI Initiative that ostensibly was to improve the hiring, retention, and promotion of Black employees, but Defendant FHI 360 was only paying lip service to a right and good imperative of its clients. CEO San Martin promised that Defendant FHI 360 would be an antiracist organization, but under her leadership, Defendant FHI 360 only ever wanted to appear as if it cared about DEI; not to change anything for the better. In the last few months alone, CEO San Martin made the organization's formerly mandatory DEI goals optional, and delayed the hiring of a DEI Chief to 2024.

120.    Continuing to work for Defendant FHI 360 caused significant health issues for Plaintiff and severe emotional distress. It became unbearable. Accordingly, in February 2023, Plaintiff tendered her resignation from Defendant FHI 360, effective April 3, 2023.

121.    Not surprisingly, Defendant FHI 360 was utterly graceless in Plaintiff's departure, demonstrating its animosity and disrespect towards Plaintiff. Defendant FHI 360 failed to announce her departure and thank her for her service, even though it did so for every other senior leader who left the organization during Plaintiff's eight-year tenure. This caused a great deal of speculation among Plaintiff's former colleagues as to why she departed suddenly and without the standard well-wishes. One former colleague even suggested that Defendant FHI 360 tell a client that Plaintiff died.

122.    As Plaintiff continues to work in the international development industry, Defendant FHI 360's rudeness will impact Plaintiff's reputation and ability to engage, partner, or work with former Defendant FHI 360 colleagues.

**Plaintiff Replaced by White Male Earning Substantially More Than She**

123. Defendant FHI 360 back-filled Plaintiff's position with a white male whom Defendant FHI 360 paid substantially more than it paid Plaintiff for the same job.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
**(Race and Color Discrimination in Violation of Title VII,
Section 1981, and the DC Human Rights Law)
Against All Defendants**

124. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

125. Defendants have discriminated against Plaintiff in violation of Title VII, Section 1981, and the DC Human Rights Law by subjecting her to different treatment on the basis of her race and color either directly or by aiding and abetting others. Plaintiff has suffered disparate treatment as a result of Defendants' wrongful conduct.

126. Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated white people, and by subjecting her to disparate terms and conditions of employment, including by paying her an unequal wage, depriving her of advancement, and constructively terminating her employment.

127. The conduct of Defendants was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

128. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law.

30

## AS AND FOR A SECOND CAUSE OF ACTION
### (Hostile Work Environment in Violation of Title VII, Section 1981, and the DC Human Rights Law) Against All Defendants

129.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

130.    Defendants have directly, or indirectly by aiding and abetting others, subjected Plaintiff to a hostile work environment on the basis of her race and color, in violation of Title VII, Section 1981, and the DC Human Rights Law. Plaintiff has suffered disparate treatment as a result of Defendants' wrongful conduct.

131.    The conditions of the hostile work environment to which Plaintiff was subjected were so severe or pervasive to substantially alter the terms and conditions of Plaintiff's employment.

132.    The conduct of Defendants was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

133.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation in Violation of Title VII, Section 1981, and the DC Human Rights Law) Against All Defendants

134.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

135.    Plaintiff complained to Defendants about the race and color discrimination to which she, and others, were subjected as employees of Defendant FHI 360.

31

136.    Plaintiff's complaints were ignored and discouraged by Defendants.

137.    Plaintiff's complaints about race and color discrimination during her employment were protected activity under Title VII, Section 1981, and the DC Human Rights Law.

138.    Defendants, unlawfully and without cause, retaliated against Plaintiff because she complained about the race and color discrimination to which she, and others, were subjected as employees of Defendant FHI 360.

139.    Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment, and failed to take any action to stop the retaliatory conduct.

140.    As a direct and proximate cause of the unlawful employment practices at Defendant FHI 360, and disregard for Plaintiff's rights, Plaintiff lost substantial income including, but not limited to, wages, social security, and other benefits.

141.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, an invasion of her right to be free from unlawful discrimination, and great humiliation. This has manifested itself in serious emotional distress.

142.    As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, and disruption of her personal life.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Violation of Equal Pay Act)**
**Against Defendant FHI 360**

143.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

144.    Defendant FHI 360 deliberately, willfully, and systematically paid Plaintiff substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility, performed under similar working conditions.

145.    Defendant FHI 360 violated the Equal Pay Act, 29 U.S.C. § 206(d) by paying Plaintiff, a female, substantially less than it paid male employees performing work requiring equal skill, effort, and responsibility.

146.    Defendant FHI 360 acted willfully.

147.    As a result of the foregoing, Plaintiff has suffered monetary damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Wage Discrimination in Violation of DC Human Rights Act)**
**Against All Defendants**

148.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

149.    Defendant FHI 360 deliberately, willfully, and systematically paid Plaintiff substantially less than it paid white employees and male employees performing work requiring equal skill, effort, and responsibility, performed under similar working conditions.

150.    Defendant FHI 360 violated the DC Human Rights Act by paying Plaintiff, a Black female, substantially less than it paid white and/or male employees performing work requiring equal skill, effort, and responsibility.

151.    Defendant FHI 360 acted willfully.

152.    As a result of the foregoing, Plaintiff has suffered monetary damages.

### JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, having set forth her Complaint, Plaintiff respectfully requests that she be awarded all available relief under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the District of Columbia Human Rights Act, including, but not limited to, economic and noneconomic compensatory damages in excess of $75,000, punitive damages, prejudgment interest, attorney fees, expenses, and costs, and all other and further relief that the Court deems just and proper.

Respectfully submitted,

LPJ LEGAL PLLC

/s/Lucrecia P. Johnson
Lucrecia P. Johnson, Esq., (Fed Bar 18533)
853 New Jersey Ave SE, Suite 200
Washington, DC 20003
(202) 643-6211
lucrecia@lpjlegal.com


GODDARD LAW PLLC

 /s/Megan S. Goddard
Megan S. Goddard
Frances Codd Slusarz
*Pro Hac Vice Application Forthcoming*
39 Broadway, Suite 1540
New York, New York 10006
Tel. 646 964-1178
megan@goddardlawnyc.com
frances@goddardlawnyc.com