# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

ALETA WILLIAMS,

              Plaintiff,

        v.

FAMILY HEALTH INTERNATIONAL
d/b/a FHI 360, *et al.*,

           Defendants.

</td><td>

Civil Action No. 24-2654 (BAH)

Judge Beryl A. Howell

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Aleta Williams alleges claims of race, color, and gender discrimination, hostile work environment, retaliation, and wage discrimination under several federal and state statutes against her former employer, Family Health International ("FHI"), known as FHI 360, Tessie San Martin, the CEO of FHI, and Deborah Kennedy, the COO and plaintiff's supervisor at FHI. *See generally*, First Am. Compl. ("FAC"), ECF No. 14. Defendants seek dismissal of plaintiff's complaint for failure to state any claim. *See* Defs.' Mot. to Dismiss, ECF No. 16. For the reasons discussed below, defendants' motion is granted in part and denied in part.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below.

### A.    Factual Background

As set forth in the 199-paragraphs of the First Amended Complaint, plaintiff, an African American woman, was employed at FHI for eight years, from March 2015 through her departure in April 2023. FAC ¶¶ 15, 133. FHI is a domestic nonprofit human development organization that works in the areas of global health, education, and economic development. *Id.* ¶ 12. After

1

her initial hiring as the Director of Strategic Partnerships, plaintiff was promoted a few months later, as part of a reorganization, to Director of Business Development and Diversification, overseeing both strategic partnerships and global business development with a team of 45 or more staff. *Id.* ¶¶ 14-15, 18-19. She alleges that she was successful in this role and received positive feedback. *See id.* ¶¶ 21, 131. Beginning with a change in leadership in 2021, plaintiff experienced conflict with new leadership over diversity, equity, and inclusion ("DEI") policies and several additional incidents, including a change in position, which, in plaintiff's view, constituted discriminatory and retaliatory conduct and created a hostile work environment. The key factual allegations are summarized here.

### 1.    *Role as Acting Managing Director of the UK Entity*

In addition to plaintiffs' primary job responsibilities as Director of Business Development and Diversification, she was made Acting Managing Director of a newly acquired entity in the United Kingdom in June 2020, tasked with working on acquisition integration. *Id.* ¶ 30. This new role gave her a seat on the Subsidiary Leadership Team, a group adjacent to the executive leadership team developed to "increase the exposure of people of color to the executive team" and seen as a pipeline to that group. *Id.* ¶¶ 22, 30.

Plaintiff alleges that with this new role, she was working two full-time jobs, yet she was still paid below market and less than her white peers for her job as Director of Business Development and Diversification. *Id.* ¶ 31. After engaging an external executive compensation consultant, plaintiff learned she was also paid below market rate by about 10% for her role as Acting Managing Director. *Id.* ¶ 32. Plaintiff asked her HR manager for a 10% raise, and after negotiation, the HR manager granted a 5% salary increase. *Id.* ¶¶ 32-35. As she was still tasked with two jobs, plaintiff then requested "an executive coach . . . to help her manage the incredibly overwhelming workload of two roles." *Id.* ¶ 35. Shortly thereafter, plaintiff learned that "a male

employee was offered an 'acting director' role, similar to Plaintiff's Acting Managing Director role, with a 20% salary increase." *Id.* ¶ 36.

### 2.    *FHI's DEI Initiatives and New Leadership*

Plaintiff alleges that during the early part of her tenure, FHI took a proactive approach to DEI, such as by creating leadership team "subsidiaries" "to increase the exposure of people of color to the executive team," including the Subsidiary Leadership Team in which plaintiff participated by virtue of her role as Acting Managing Director, by prioritizing having a diverse pool of candidates for hiring, and by instituting a DEI Initiative to address racial disparities. *See id.* ¶¶ 22-29.

Beginning in early 2021 with the departure of the prior CEO, plaintiff alleges FHI's attitude toward DEI changed.  COO Kennedy shifted toward a bottom-up rather than top-down approach and asserted that the DEI initiative was not "about race only," which plaintiff perceived as "reject[ing] a focus on race," despite racial disparities being its core purpose. *Id.* ¶¶ 38-43. When CEO San Martin, who is "Cuban-American and 'white-passing'" joined FHI in September 2021, plaintiff alleges that this CEO only made an effort to get to know her white, or "white passing" colleagues. *Id.* ¶¶ 46-47.

Early in San Martin's tenure, several incidents reinforced plaintiffs' view that San Martin was not prioritizing DEI. *See id.* ¶ 48.  For instance, San Martin outsourced oversight of the DEI initiative to an external consulting firm. *Id.* ¶ 54.  She also cancelled her meeting with the African American Employee Resource Group ("ERG"), of which plaintiff was the executive sponsor, and "claimed it would be months before she would be free to meet with them," despite promptly meeting with the other ERGs. *Id.* ¶¶ 63-64.  She only reinstated the meeting when plaintiff pointed out this was a "bad look" for her. *Id.* ¶ 65.  San Martin also "dismantled" most of the leadership team "subsidiaries" intended as pipelines for people of color and "demoted

3

Asian and Black employees from their management positions in the subsidiaries to non-management or less prominent positions" within the organization, replacing them with white or "white-passing candidates." *Id.* ¶¶ 75-77.

### 3. *DEI Program Criticism and Attribution to Plaintiff*

When the outsourced DEI program was "suffering" because the organization failed to make it a priority, a white colleague mentioned that the "DEI initiative was a failure." *Id.* ¶ 55. On October 13, 2021, San Martin attributed this comment to plaintiff during a team videoconference. *Id.* ¶ 56. Plaintiff believes the CEO did so because plaintiff "is Black," and San Martin "stereotyped her as an 'Angry Black Woman' who complains about racial issues." *Id.* Plaintiff corrected San Martin, and the white colleague acknowledged the statement had been hers, but San Martin became "argumentative" and did not apologize. *Id.* ¶¶ 57-58.

### 4. *Plaintiff is Removed from Acting Managing Director Role*

On November 24, 2021, San Martin informed plaintiff that she would be replaced as the Acting Managing Director of the UK entity to focus on her Business Development and Diversification role, noting that this was a "big job" and she should be "set up for success." *Id.* ¶ 70 (internal quotations omitted). Plaintiff alleges that San Martin removed her from the UK role because plaintiff "challeng[ed] [her] snub of the African American ERG." *Id.* ¶ 70.

Plaintiff was replaced by a white male colleague, John Doe, who had been previously working with plaintiff and whom plaintiff had given a more forward-facing role with San Martin because plaintiff believed she more readily accepted ideas coming from him than from her. *Id.* ¶¶ 68-69, 72. Plaintiff had recommended that San Martin select a more qualified British Indian woman to fill the role, but San Martin did not interview that qualified candidate. *Id.* ¶ 72.

When plaintiff was removed from the Acting Managing Director role, her salary was reduced to the salary she had as only Director of Business Development and Diversification,

before she had negotiated a 5% raise for taking on the additional role. *Id.* ¶ 92. Plaintiff does not believe that FHI normally "decrease[s] employees' salaries after they complete acting roles" and not to the extent they decreased hers. *Id.* The removal of plaintiff from the UK role also meant she was no longer a member of the Subsidiary Leadership Team, providing a pipeline to the executive team. *Id.* ¶ 79. Plaintiff felt her influence in the organization was greatly reduced, describing herself as a "lame duck." *Id.*

### 5.    *Plaintiff Raises Concerns with HR Investigator*

Plaintiff went to the "human resources investigator responsible for handling internal complaints about discrimination," Dawn Fisher, and discussed San Martin's behavior, including the CEO's snub of the African American ERG meeting, her accusation of plaintiff calling the DEI Initiative a "failure," and her removal of plaintiff from the Acting Managing Director role in favor of a less experienced white man. *Id.* ¶ 73. These complaints were not investigated. *Id.* ¶ 74.

### 6.    *FHI's Continued Approach to DEI and Plaintiff's Pushback*

Plaintiff continued to take issue with FHI's failure to address systemic problems with racial disparities in the organization and to push back against leadership. In November 2021, defendant FHI received a report "it had commissioned to 'support' the DEI Initiative." *Id.* ¶ 81. The survey reflected "a culture of marginalization and bullying of Black employees," leading to a high turnover rate, as well as "salary concerns, promotion bias, and frequent microaggressions" such that Black women were "experiencing trauma from the working conditions." *Id.* ¶ 82. The organization instituted a 16-hour diversity training requirement on acknowledging impact with respect to offensive statements, even in the case of good intent, but did not change other policies or take other action. *Id.* ¶¶ 83-84.

In April 2022, San Martin began the search for a Chief of Staff, and plaintiff suggested they outsource recruitment to get a diverse pool of candidates. *Id.* ¶ 85. Nonetheless, San Martin only interviewed white people and selected a white man for the position. *Id.* Contrary to the usual practice, HR did not vet the new hire. *Id.* ¶ 86. Rather, plaintiff and others found "alarming content" on the new hire's social media, including "racist posts" and posts supporting "far right politicians." *Id.* When these concerns were raised, San Martin simply cited the candidate's "diversity of thought." *Id.* Plaintiff made an "impassioned appeal" against the candidate at a leadership meeting and explained how "diversity of thought" was "weaponized against marginalized people." *Id.* ¶ 87. She also expressed her frustration with the organization's "indifference to racial diversity." *Id.* ¶ 88. The candidate was asked to withdraw acceptance of the offer, and he was compensated to do so. *Id.* ¶ 89.

Plaintiff then complained again to colleague Fisher about San Martin's "discriminatory practices" and inquire about efforts to improve the experiences of Black staff. *Id.* ¶ 90. Fisher stated no such efforts were underway. *Id.* ¶ 91.

That same spring, a new white employee was hired to fill an open role in a particular department and paid a "much higher salary" than what existing Black employees in that department working in the same role were making. *Id.* ¶ 125. Colleague Doe pointed out this pay inequity and requested that FHI pay the existing Black employees more. *Id.* ¶ 126. FHI accordingly reduced the offer to the new white employee and gave a "modest raise" to the existing Black employees. *Id.*

### 7.    *Request for Additional Work and Characterization of Plaintiff as "Angry"*

In June 2022, Director Bragale asked plaintiff and her direct report, a white woman named Andy Turner, to take on a new significant project. *Id.* ¶ 93. Both responded that they

could not take on the project because of their existing priorities. *Id.* ¶ 94.  During a July

leadership meeting, Bragale and another white colleague discussed plaintiff's refusal to take on

the project and described her as "angry" and "bitter" about the request.  Turner was not so

characterized. *Id.* ¶ 96.  Plaintiff felt embarrassed and offended to be so characterized in such a

public forum. *Id.*  Plaintiff raised the incident with San Martin and HR, and San Martin

acknowledged she had received other complaints about Bragale but took no action. *Id.* ¶ 97.

### 8.    *Meetings Raising Concerns about Treatment of Black Staff*

In a subsequent July 2022 leadership meeting, San Martin raised the subject of

psychological safety in the workplace, encouraging leaders to "assume good intent and be kind"

and to push back on others' ideas. *Id.* ¶¶ 98, 100.  Plaintiff took issue with this approach because

of the implication that those complaining of disparate treatment are wrong to assume the conduct

was because of their gender or race. *Id.* ¶ 99; *see id.* ¶¶ 102-03.  Plaintiff also explained that

Black employees may be labeled as disagreeable or angry when they push back. *Id.* ¶¶ 100-01.

She recommended psychological safety training for leaders, but San Martin doubled down on the

importance of intent and brushed off the suggestion. *Id.* ¶ 104.

Later that month, plaintiff became aware of an HR document regarding attrition and that

the report had only been revealed after months of HR delaying doing so. *Id.* ¶¶ 108-09.[1]  The

document rejected discrimination as the reason for attrition among Black women, explaining the

data did not differentiate between microaggressions and oversensitivity. *Id.* ¶ 110.  At the late-

July leadership meeting where the report was presented, plaintiff asked how Black employees are

supposed to thrive if this is how the organization viewed racism and depicted those experiencing

---

[1]    A similar report was released in October 2022 on turnover rates, revealing high turnover for Black
employees and that these employees perceived pervasive microaggressions and were labeled as "over-sensitive" if
they pushed back.  FAC ¶ 128.  These employees also complained frequently in exit interviews about pay inequality,
biased promotions, microaggressions, and a hostile work environment. *Id.* ¶ 129.

mistreatment as overly sensitive.  *Id.* ¶ 112.  Plaintiff explained that the organization's emphasis

on intent rather than impact absolved white employees from accountability for discriminatory

behavior.  *See id.* ¶ 112-15.

### 9.    *Plaintiff Obtains Representation and is Isolated by Leadership*

In between the two July leadership meetings, on July 15, 2022, plaintiff's counsel sent a

Letter of Representation to FHI to indicate that they were representing plaintiff regarding

discrimination at the company.  *Id.* ¶ 106.  Plaintiff alleges that the HR director "decreed that . . .

FHI 360 should avoid firing Black women, for fear they would all hire lawyers."  *Id.* ¶ 107.

Thereafter, plaintiff noticed a significant difference in how San Martin and Kennedy

interacted with her.  San Martin "frequently cancelled their bi-monthly check-ins to avoid[]

speaking with plaintiff."  *Id.* ¶ 119.  She also "overhaul[ed] aspects of plaintiff's work, despite

not having previously reviewed or participated in the work."  *Id.*  COO Kennedy also "walled-off

plaintiff from significant decisions relating to her team, severely diminishing [her] influence."

*Id.* ¶ 120.  She excluded her from key business development meetings and "started shifting

business development employees away from plaintiff's reporting line."  *Id.*  ¶¶ 120-21.  She also

approved hiring of employees in business development "without involving Plaintiff."  *Id.* ¶ 120.

In September 2022, FHI hired consultants from Accenture to make operational

recommendations, and plaintiff was placed on the steering committee to work with them.  *Id.*

¶ 122.  At some point shortly after, plaintiff was removed from the steering committee team and

replaced by white colleagues.  *Id.* ¶ 123.

### 10.    *Plaintiff's Departure*

Plaintiff received feedback during her 2022 performance evaluation that while her team

respected plaintiff, they did not always feel they could approach her because she "had become

reserved and less approachable."  *Id.* ¶ 131.  She felt that COO Kennedy was reflecting that

plaintiff did not assume good intent and instead recognized microaggressions, against FHI's new practice.  *Id.*

Plaintiff experienced "significant health issues" and "severe emotional distress" as a result of her treatment at FHI, which led her to resign in February 2023.  *Id.* ¶ 133.  She left the organization in April 2023.  *Id.*  She was not recognized for her service, nor was her departure formally announced.  *Id.* ¶ 134.  Plaintiff continues to work in the international development industry and feels that her reputation has been diminished by defendants.  *Id.* ¶ 135.

Upon plaintiff's departure, her role was upgraded from a director level to a vice-president level; plaintiff had often complained her role had been under-leveled.  *Id.* ¶ 136.  A white man filled plaintiff's position and was "paid substantially more" than plaintiff for the same job.  *Id.* ¶ 137.  That man only lasted three weeks and then was replaced by a white woman "who was less qualified than plaintiff."  *Id.* ¶ 138.

### B.    Procedural Background

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Office of Human Rights on May 23, 2023. *Id.* ¶ 10.  The EEOC issued a dismissal and Notice of Rights letter on June 26, 2024.  *Id.* ¶ 11. Plaintiff filed the instant lawsuit in September 2024, *see* Compl., ECF No. 1, with an amended complaint filed in January 2025, *see* FAC.

Plaintiff asserts claims of race, color, and gender discrimination, retaliation, and a hostile work environment, under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, under Section 1 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.11 *et seq.* and 2-1402.61 *et seq.*  FAC ¶¶ 139-86.  Plaintiff has also alleged pay discrimination under the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*, and the DCHRA.  FAC

¶¶ 187-98.  These claims are separated into seven counts in her Amended Complaint: (1) race, color, and gender discrimination and hostile work environment, in violation of Title VII (Count I); (2) retaliation, in violation of Title VII (Count II); (3) race and color discrimination and hostile work environment, in violation of 42 U.S.C. § 1981 (Count III); (4) retaliation, in violation of § 1981 (Count IV); (5) race, color, and gender discrimination and hostile work environment, in violation of the DCHRA (Count V); (6) retaliation, in violation of the DCHRA (Count VI); (7) violation of the Equal Pay Act (Count VII); and (8) wage discrimination, in violation of the DCHRA (Count VIII).

Defendants seek dismissal of all counts, under Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff failed to plead facts establishing that defendants took any adverse employment action against her, that she was treated less favorably based on her protected class, that she was subject to severe or pervasive conduct creating an objectively hostile or abusive workplace due to her protected characteristics, that she engaged in any protected activity, that defendants took any retaliatory action against her because of that activity, or that she was paid less than employees outside her protected classes for similar work in effort, skill, and responsibility.  *See* Defs.' Mem. in Supp. of MTD ("Defs.' Mem.") at 1-2, ECF No. 16-1. Plaintiff opposes the motion to dismiss.  *See* Pl.'s Opp'n to Defs.' MTD ("Pl.'s Opp'n"), ECF No. 23.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts not "'merely consistent with' a defendant's liability" but that

"allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A complaint still "survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible.'" *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (alteration in original) (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 119, 1129 (D.C. Cir. 2015)).

Courts accept all factual allegations as true when evaluating a 12(b)(6) motion, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, and construe all reasonable inferences in the plaintiff's favor, *see VoteVets Action Fund*, 992 F.3d at 1102. They do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## III.    DISCUSSION

Plaintiff has not alleged sufficient facts to infer that she suffered any actionable adverse employment actions by defendants, thus failing to state a claim on her claims of racial and gender discrimination, Counts I, III, and V, under all three statutes she invokes as being violated. Nor has plaintiff sufficiently pled facts indicating working conditions so severe and pervasive to constitute a hostile working environment under that alternative theory for the same three counts. Further, plaintiff has not alleged any materially adverse employment action taken in response to protected activity to state a claim for retaliation, in Counts II, IV, and VI, under any of the three statutes she invokes as violated. Plaintiff has, however, stated a claim of pay discrimination, in Counts VII and VIII, under the EPA and DCHRA, respectively. Defendants' motion to dismiss

is therefore granted in part, with respect to Counts I through VI, and denied in part, with respect to Counts VII and VIII, for the reasons set out in more detail below.

### A.  Plaintiff's Claims of Discrimination on the Basis of Race, Color, or Gender under Title VII, § 1981, and DCHRA (Counts I, III, and V)

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, § 1981 "prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (quoting 42 U.S.C. § 1981). The DCHRA likewise prohibits employers from "fail[ing] or refus[ing] to hire," discharging, or "otherwise . . . discriminat[ing] against any individual, with respect to his or her compensation, terms, conditions, or privileges of employment, including promotion" based on his or her "race, color, religion, national origin, sex, age," and several other protected grounds. D.C. Code § 2-1402.11(a)(1)(A).

Discrimination is evaluated using the same standard under all three of these statutes. *See Ayissi-Etoh*, 712 F.3d at 576 (describing how Title VII and § 1981 discrimination claims are evaluated under similar standards); *Guajacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (assessing Title VII and DCHRA discrimination claims under the same framework); *Doe 1 v. George Wash. Univ.*, 369 F. Supp. 3d 49, 69 n.11 (D.D.C. 2019) ("[I]t is well-established that the D.C. Human Rights Act and Title VII claims are analyzed using the same legal standards."). The "two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin . . . ." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Plaintiff here has not

alleged that she suffered an adverse employment action, so her complaint fails to state a claim of discrimination under Counts I, III, and V.

At the outset, defendants focus on the statutes of limitation on plaintiff's claims, given that plaintiff's allegations "span almost a decade." Defs.' Mem. at 5. The longest statute of limitations period that applies to plaintiff's claims is four years, under § 1981. *See Graves v. District of Columbia*, 777 F. Supp. 2d 109, 115-16 (D.D.C. 2011) (explaining that in some circumstances a three-year period applies to § 1981 claims and in others, a four-year period applies); Defs.' Mem. at 7 (arguing a four-year period applies); Pl.'s Opp'n at 3-5 (not contesting this time period). Given that all of plaintiff's allegations fall within the four-year period (dating back to September 16, 2020), plaintiff's allegations must be considered in full at least for her § 1981 claim. As discussed herein, those allegations fail to state a claim under § 1981 and therefore under any of the three statutory causes of action (given that they have the same standard), so whether those allegations are timely under Title VII and the DCHRA need not be decided. The same is true for plaintiff's hostile work environment and retaliation claims under the same three statutes. *See infra* Parts III.B-III.C.

"To bring a . . . discrimination claim under" the three statutes at issue, the plaintiff must allege that . . . 'she suffered an adverse employment action.'" *Jones v. District of Columbia*, No. 23-cv-1488 (BAH), 2024 WL 1213326, at *7 (D.D.C. 2024) (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)); *see Douglas v. Donovan*, 559 F.3d 549, 551-52 (D.C. Cir. 2009). "An adverse employment action sufficient to sustain a Title VII discrimination claim must amount to a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Gomez v. McDonough*, No. 21-cv-1685 (BAH), 2022 WL

1471375, at *7 (D.D.C. 2022) (quoting *Douglas*, 559 F.3d at 552). "[N]ot everything that makes

an employee unhappy is an actionable adverse action." *Douglas*, 559 F.3d at 552 (quoting

*Russell*, 257 F.3d at 818); *see also Burlington N. & Santa Fe. Ry. Co.* ("*BNSF*") *v. White*, 548

U.S. 53, 68 (2006) (explaining that Tile VII "does not set forth 'a general civility code for the

American workplace'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80

(1998))). Although a plaintiff need not show "objectively tangible harm" from an act for the act

to constitute an actionable adverse employment action, which the law previously required, the

plaintiff must still demonstrate an effect on her "terms, conditions, or privileges of employment,"

and not everything that happens at a workplace meets that standard. *See Chambers v. District of

Columbia*, 35 F.4th 870, 874-75 (D.C. Cir. 2022). "For example, 'changes in assignments or

work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied

by a decrease in salary or work hour changes.'" *Jones*, 2024 WL 1213326, at *7 (quoting

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)). By contrast,

"discriminatory transfers or denial of transfer requests do amount to cognizable harms under

Title VII." *Id.* (citing *Chambers*, 35 F.4th at 872).

  Here, defendants argue that plaintiff has not alleged any cognizable adverse employment

action suffered. *See* Defs.' Mem. at 9-12. In her briefing, plaintiff identifies four potential

adverse employment actions from her complaint: (1) the "demotion" from her position as Acting

Managing Director, which also resulted in a decrease in salary, (2) "remov[al] from a steering

committee that offered leadership opportunities and career advancement," (3) a critical

evaluation, and (4) constructive discharge. Pl.'s Opp'n at 11; *see also id.* at 10. Considering

each in turn and in context, none constitutes an actionable adverse employment action.

To start, plaintiff alleges that San Martin removed her from the position of Acting Managing Director in November 2021 because of her race and gender. *See* FAC ¶ 142. The additional pay that she had negotiated from taking on that role in addition to her normal responsibilities as Director of Business Development and Diversification was, as a result, removed from her salary. *See id.* ¶ 92. She also lost her seat as a member of the Subsidiary Leadership Team, which she viewed as a pipeline to executive positions in the company. *Id.* ¶ 79.

Removal from a temporary post, however, generally does not constitute an adverse employment action, as defendants point out. *See* Defs.' Mem. at 31 n.16. "[T]he D.C. Circuit has held that . . . [a] temporary designation is not one of the terms, conditions, or privileges of employment contemplated by Title VII." *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (citing *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997)). Indeed, plaintiff alleges no facts suggesting that removal from the Acting Managing Director position affected the terms, conditions, or privileges of her regular employment as Director of Business Development and Diversification. To be sure, plaintiff's total salary was lowered as a result of losing the Acting position, but, as alleged, the reduction merely restored her salary to the level before she had negotiated for higher pay for taking on the additional temporary role. *See* FAC ¶ 92. Thus, her salary was not diminished for her position as Director of Business Development and Diversification.

Moreover, plaintiff's other allegations undermine any suggestion that her removal from the Acting Managing Director position should be considered "adverse." While that position did give her greater responsibility, more pay (that she specifically negotiated), and a seat on the Subsidiary Leadership Team, plaintiff at the outset expressed concern about taking on the new

role.  She described the workload of the Acting role, on top of her regular responsibilities, as "incredibly overwhelming" and requested an "executive coach . . . to help her manage."  *Id.* ¶ 35. Indeed, plaintiff seemed to remain busy in her Business Development role, having to turn down new projects several months later in spring of 2022.  *See id.* ¶¶ 93-94.  Relieving plaintiff from the double workload therefore appears to have been at least a neutral development.

Plaintiff does not argue that temporary positions are part of the "terms, conditions, or privileges" of one's employment such that her removal should be considered an adverse employment action.  Rather, plaintiff argues that defendants have "introduce[d] facts extraneous to the Complaint" because plaintiff did not allege that the position was temporary.  Pl.'s Opp'n at 20.  The term "Acting," however, makes clear that plaintiff's position was not intended to be permanent, and plaintiff also indicated that acting roles are generally time-limited by alleging that they are "complete[d]" while employees remain at the organization in other roles.  *See* FAC ¶ 92 ("FHI 360 does not normally decrease employees' salaries after they complete acting roles.").  Plaintiff points to no allegations to the contrary.

Plaintiff also tries to rebut the principle stated in *Stewart*, 275 F.3d at 1135, about temporary positions by distinguishing the facts of that case.  *See* Pl.'s Opp'n at 20.  The plaintiff in *Stewart* alleged that defendants interfered with and delayed her achievement of an acting role. *See Stewart*, 275 F. 3d at 1135.  After noting the plaintiff nonetheless obtained the role, the court opined that even if she had not, temporary roles are not part of the terms, conditions, or privileges of employment.  *See id.*  As a result, the D.C. Circuit's comment about temporary designations was seemingly dicta, and the instant plaintiff's challenged action involving *removal*

is factually distinct.  Regardless, *Stewart*'s dicta is persuasive and relevant to plaintiff here; tellingly, plaintiff has offered no reasons why this Court should reason differently. [2]

Plaintiff's second listed potential adverse action is removal from the Accenture consulting group steering committee.  *See* Pl.'s Opp'n at 11; FAC ¶¶ 122-23.  The steering committee position, like the Acting Managing Director role, was intended to be temporary in nature—the committee was created to obtain certain recommendations from the consultants, FAC ¶ 122—so her removal from the committee also does not constitute an actionable adverse employment action.  In any event, plaintiff's complaint does not describe any clear harm resulting from no longer being on the Accenture committee.  Although she asserts that this meant she "no longer played a role in setting priorities for business development," *id.* ¶ 123, she does not provide any facts explaining why or how this affects the privileges and conditions of her regular job.  Her briefing describes the committee as providing "leadership opportunities and career advancement," but she does not cite to any facts in the complaint establishing those opportunities, in contrast to those described for other committees like the Subsidiary Leadership

---

[2]    Plaintiff also has not pled facts allowing for an inference of discrimination with respect to her removal from the Acting Director position, as is required to state a claim of discrimination.  *See Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 529-30, 533 (D.C. Cir. 2025) (requiring plaintiff to plead facts allowing for the Court to plausibly infer an inference of discrimination).  Plaintiff essentially alleges that San Martin provided a logical, nondiscriminatory reason for removing plaintiff: San Martin agreed with plaintiff's own earlier comment about the intensity of her workload, *see* FAC ¶ 35, explaining that the Director of Business Development and Diversification role was a "big job" and she should be "set up for success," *id.* ¶ 70.  Plaintiff also alleges in her complaint that employees "complete" acting roles, indicating that the positions are not meant to be retained permanently.  *Id.* ¶ 92. These facts strongly imply that San Martin removed plaintiff in the normal course of reviewing temporary positions due to concerns about the latter's workload, which in plaintiff's own words amounted to "perform[ing] two full time jobs." *Id.* ¶ 31.

Plaintiff does not allege other facts that allow for a competing inference of discrimination to sustain her claim.  Although she alleges that she was replaced by a white man with less experience to whom San Martin "responded more favorably," *see id.* ¶¶ 68, 72-73, and identifies other circumstances that plaintiff describes as creating "a general environment that was discriminatory toward Black women," Pl.'s Opp'n at 13, plaintiff does not sufficiently connect these facts to San Martin's decision to remove her from the acting role.  Nor does she identify similarly situated employees outside of her protected classes who were treated differently with respect to removal from acting roles.  As a result, even if her removal were an actionable adverse employment action, plaintiff would not state a claim of discrimination.

Team.  *See* Pl.'s Opp'n at 11.  Given that changes in duties or work-related assignments

generally do not constitute adverse employment actions, *see Jones*, 2024 WL 1213326, at *7,

plaintiffs' vague allegations about not playing a role in setting certain types of priorities do not

allow for an inference that the impact of being removed from the Accenture team was

sufficiently significant to qualify.

      Plaintiff also refers to a "critical evaluation."  Pl.'s Opp'n at 11.  Plaintiff's complaint,

however, does not actually allege any obvious critical evaluation.  Her 2022 performance review

included only a sole comment plaintiff perceived as negative, alongside a positive one: "[W]hile

her team commented they respected and felt safe with plaintiff, her peers felt they could not

always approach [p]laintiff because [p]laintiff had become reserved and less approachable. . . .

Kennedy remarked favorably upon plaintiff's creation of a psychologically safe space for her

team, and recognizing and championing her team and their achievements."  FAC ¶ 131.  Even if

that could be construed as a "critical evaluation," negative evaluations are not adverse

employment decisions except in the rare circumstance where such an evaluation impacts

position, grade, level, salary, or promotion opportunities.  *See Douglas*, 559 F.3d at 552-53

("[P]erformance evaluations ordinarily are not actionable under Title VII" when they "do not

obviously result in a significant change in employment status."); *see, e.g.*, *Ayo-Aghimien v. Att'y*

*Gen.*, No. 24-cv-1341 (DLF), 2025 WL 407308, at *6 n.4 (D.D.C. Feb. 5, 2025)

("'[I]nterlocutory or mediate decisions,' such as disciplinary referrals or negative inputs to an

employee's review, are not materially adverse employment actions when they do not affect the

plaintiff's 'terms, conditions, or privileges of employment or future employment opportunities.'"

(first quoting *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 26 (D.D.C. 2005), and then quoting

*McCallum v. Mayorkas*, No. 21-cv-1911 (ABJ), 2023 WL 3203011, at *13 (D.D.C. May 2,

2023))); *cf. Turner v. U.S. Capitol Police Bd.*, 983 F. Supp. 2d 98, 107 (D.D.C. 2013)

(explaining that a "meets expectations" evaluation could not constitute an adverse employment

action in the retaliation context where no facts were pled showing how it would impact bonus,

promotion, or pay decisions or how it would impact professional opportunities), *aff'd*, 653 F.

App'x 1 (D.C. Cir. 2016).

        Lastly, plaintiff alleges that she suffered "constructive discharge" due to her treatment at

FHI: "Continuing to work for Defendant FHI 360 caused significant health issues . . . and severe

emotional distress" such that a reasonable person would have felt compelled to resign.  FAC

¶ 133.  Although plaintiff correctly states the threshold for constructive discharge—that plaintiff

was "discriminated against by h[er] employer to the point where a reasonable person in [her]

position would have felt compelled to resign," *Green v. Brennan*, 578 U.S. 547, 555 (2016)—she

has not alleged facts that rise to such a level of intolerability.

        In considering a claim about constructive discharge, courts evaluate the circumstances

objectively and ask whether "the conditions made remaining in the job unbearable."  *Robinson-*

*Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 17 (D.D.C. 2008) (quoting *Kalinoski v.*

*Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006)), *aff'd* 417 F. App'x 4 (D.C. Cir. 2011).

"[R]esignations . . . are presumed to be voluntary."  *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir.

2010) (first alteration in original).  Therefore, "the D.C. Circuit has indicated that where

discrimination or retaliation contribute to the alleged constructive discharge, as plaintiff asserts

happened here, a plaintiff must demonstrate the existence of 'aggravating factors' that made her

working conditions objectively intolerable."  *Robinson-Reeder*, 532 F. Supp. 2d at 17 (quoting

*Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. Cir. 1981)).

"The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination." *Kalinoski*, 435 F. Supp. 2d at 78. Denial of medical leave requests, for instance, with an "accompanying decision to place [the employee] on leave without pay," an involuntary reassignment, and "non-selection" for an open position, for instance, would not suffice. *Id.* at 79-80; *compare Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000) (explaining, in a race-discrimination case, that a person "who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be . . . intolerable"). Generally, "[a]bsent some indication that the employer was trying to drive the employee from the workplace entirely or that the employee 'quit just ahead of the fall of the axe,' the law will not permit a resignation to be transformed into a discharge." *Kalinoski*, 435 F. Supp. 2d at 78 (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)). In other words, "[c]onstructive discharge does not . . . 'occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness.'" *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Taylor,* 132 F.3d at 766).

Plaintiff has not pled any facts suggesting FHI or defendants San Martin or Kennedy wanted to get her to leave, even accepting reasonable inferences that they began devaluing plaintiff's work and decreasing her sphere of influence. In sum, plaintiff alleges that she was removed from an acting position, which resulted in a reversion to her salary to that for her main role as Director of Business Development and Diversification; she raised with leadership her disagreements over workplace culture, including treatment of Black employees and approaches to DEI and hiring; she was labeled as "angry" in response to not taking on additional work; she

was isolated from leadership and some meetings; she received an evaluation with one comment she perceived as negative; and she was paid less than white, male employees. *See supra* Part I.A. Such workplace strife may be distressing, but these circumstances do not rise to the level of objectively intolerable, nor indicate "aggravating factors" beyond ordinary discrimination that would transform her resignation into a constructive discharge.

Plaintiff argues that the issue of constructive discharge is "ultimately a matter of fact for the jury"—whether the conditions were "sufficient to make a reasonable person quit." Pl.'s Opp'n at 31. "[B]ut simply invoking the words 'constructive discharge,' without more, will not carry an otherwise insufficient complaint over the line of plausibility" to withstand a motion to dismiss. *Valentine v. Towers Condominium Ass'n*, 22-cv-3216 (JMC), 2024 WL 1299462, at *3 (D.D.C. Mar. 26, 2024). Plaintiff must allege facts that allow for a plausible inference of constructive discharge in order to sustain her discrimination claim on that theory of an adverse employment action, and she has not met that threshold here.

Plaintiff cannot state a claim under Title VII, § 1981, or DCHRA for racial and gender discrimination without alleging she suffered an adverse employment action. *See Black v. Guzman*, No. 22-cv-1873 (BAH), 2023 WL 3055427, at *8 (explaining that a "plaintiff cannot avoid dismissal of her Title VII discrimination claim by baldly stating" that "alleged employment action[s] adversely affected the terms, conditions, or privileges of employment without proffering supporting facts or allegations"); *Turner*, 983 F. Supp. 2d at 106 (holding that because the identified harm did not constitute an adverse employment action, plaintiff could not "base a discrimination claim on it"). Plaintiff therefore has not stated a claim of discrimination under Counts I, III, or V.

**B.      Plaintiff's Claims of Hostile Work Environment under Title VII, § 1981, and DCHRA (Counts I, III, and V)**

Plaintiff alleges, as an alternative theory for Counts I, III, and V, that she was subject to a hostile work environment, violating Title VII, § 1981, and the DHCRA.  To establish a *prima facie* case, a plaintiff must show "(1) that the plaintiff is a member of a protected class; (2) the employee was subjected to unwelcome[] harassment . . .; (3) the harassment complained of was based upon [the plaintiff's protected status]; (4) the charged [] harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . .; and (5) the existence of respondeat superior liability."  *Slate v. Pub. Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 302 (D.D.C. 2014) (alterations in original) (quoting *Davis v. Coastal Int'l Sec., Inc.*, 275 F. 3d 1119, 1122-23 (D.C. Cir. 2000)); *see Joyner v. Morrison & Foerester LLP*, 140 F.4th 523, 534 (D.C. Cir. 2025) ("To make out a hostile work environment claim, a plaintiff must plausibly plead that 'he was exposed to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" (additional internal quotation marks omitted) (quoting *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017))).  The standard for a hostile work environment is the same under all three statutes.  *See Daniel v. Johns Hopkins Univ.*, 118 F. Supp. 3d 312, 319 (D.D.C. 2015); *Joyner*, 140 F.4th at 534 (applying the same standard to Title VII and § 1981 claims).

A hostile work environment is one "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  "To determine 'whether an actionable hostile work environment claim exists,' courts must look 'to all the circumstances, including the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferences with an employee's work performance.'" *Gomez*, 2022 WL 1471375, at *10 (quoting *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 410 U.S. at 21. "[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart*, 275 F.3d at 1133. Therefore, dismissal is "appropriate when a complaint lacks allegations of behavior 'so objectively offensive as to alter the conditions of [her] employment.'" *Gomez*, 2022 WL 1471375, at *10 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Defendants argue that plaintiff has not alleged behavior sufficiently pervasive, severe, and objectively offensive to constitute a hostile work environment. *See* Defs.' Mem. at 16-21. As summarized in the previous section, *see supra* Part III.A, plaintiff alleges that she was removed from her Acting Managing Director position, paid less than her white, male peers, described as "angry" on one occasion and falsely accused of making a negative comment on another occasion, ignored and cut off from certain meetings and decisions by defendants San Martin and Kennedy, and subject to a perceived critical comment in a performance evaluation. *See* FAC ¶¶ 30-36, 56-60, 70, 79, 92, 95-96, 118-121, 123, 131, 136-37; *supra* Part I.A. Plaintiff also identifies discontent expressed by Black employees—Black women, in particular—at the organization, resulting in their higher attrition rates and disagreements with leadership over the

approach to DEI and hiring.  *See* Pl.'s Opp'n at 29; FAC ¶¶ 108-10, 128-30.³  These incidents do not together rise to state a hostile work environment claim.

While plaintiff perceived discrimination and mistreatment, she has not alleged "the sort of 'deeply offensive' discriminatory comments or conduct that, combined with other allegations of interference and denied privileges, might state a hostile work environment claim."  *Gomez*, 2022 WL 1471375, at *11.  The single accusation that she made the negative comment about the DEI program and the single instance where she was labeled as "angry" are not comparable to the kind of repeated offensive comments and false accusations found to establish a hostile work environment to withstand a motion to dismiss.  *See, e.g.*, *Ayissi-Etoh*, 712 F.3d at 577 (holding that plaintiff established a *prima facie* claim for hostile work environment by showing she had been referred to by a racial epithet, been subject to another racially offensive comment, and denied a raise); *Parris v. Becerra*, No. 20-cv-3363 (CJN), 2022 WL 306193, at *5 (D.D.C. Feb. 2, 2022) (establishing that plaintiff pled a hostile work environment claim where he alleged "repeated use of offensive racial stereotypes by his supervisors," including "a number of episodes . . ., including when he was called an 'angry black man,'" "repeated insults" in the form of prohibiting him from speaking at meetings, "repeated differential treatment work-related requests, and frequent changes to his assignments in a manner designed for him to fail"); *Wise v.*

---

³        Plaintiff also argues that part of the abusive conduct was "[d]efendants['] refus[al] to investigate any of [p]laintiff's complaints of discrimination," Pl.'s Opp'n at 29, but plaintiff has not alleged that she made specific complaints necessitating investigation, nor does she allege that she requested investigation and such investigation was refused, *see* FAC ¶ 74.  The first time plaintiff complained to Fisher, she raised the issue of the CEO's snub of the African American ERG, *see id.* ¶ 73, but the CEO had in fact attended the ERG meeting at that point, *id.* ¶¶ 65-66, suggesting the issue had been resolved.  Plaintiff also raised the accusation that plaintiff had called the DEI initiative a failure, plaintiff's removal from her Acting Managing Director role, *id.* ¶ 73, and plaintiff being labeled as "angry" by Director Bragale, *id.* ¶ 92.  Yet, even assuming these workplace actions were misfortunes, they do not indicate discrimination necessitating formal investigation.  Similarly, plaintiff's complaints to Fisher the second time about the CEO's "discriminatory practices" and how the CEO "presented herself with Black employees," *id.* ¶ 90, are too general to infer that defendants should have investigated.  As a result, plaintiff has not alleged any refusal to investigate constituting abusive behavior that could contribute to a hostile work environment.

*Ferriero*, 842 F. Supp. 2d 120, 126 (D.D.C. 2012) (holding that plaintiff adequately pled a hostile work environment by alleging "myriad incidents ranging from threats of discipline based on false accusations to being singled out and excluded from trainings and award ceremonies and denied promotions"); *see also Cuthbertson v. First Star Logistics, LLC*, 638 F. Supp. 3d 581, 592-93 (W.D.N.C. 2022) (holding that single comment to "not be the angry black woman" did not establish "severe or pervasive" abuse "to support a hostile work environment claim," despite "being reprehensible").

Moreover, the other alleged abusive behavior—her removal from the Acting Managing Director position, being shut out from certain meetings and ignored, and her performance evaluation—are not objectively offensive actions but rather "ordinary," albeit unpleasant, "actions taken by supervisors at the workplace," and "such 'work-related actions by supervisors' are typically not found sufficient to state a hostile work environment claim." *Gomez*, 2022 WL 1471375, at *12 (quoting *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)). This Court and other judges in this district have held that a plaintiff failed to state a claim when even more significant adverse work-related behavior was alleged. *See id.* (where plaintiff alleged "receipt of a lower performance rating, the public delivery of his annual performance review, several denied requests for leave and to swap shifts, and his non-selection for the Lead Watch Officer role"); *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014) (where plaintiff alleged "promotion denials, a subjective performance review, and being hired at a lower grade than Caucasian employees"); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").

Plaintiff also cites to her allegations about the general dissatisfaction of black employees at the organization—resulting in high attrition and frequent complaints about microaggressions and hostility—as supporting her hostile work environment claim. Pl.'s Opp'n at 29. While those effects could certainly be caused by a hostile work environment, they do not alone demonstrate the existence of one. Plaintiff has not pled specific facts depicting how she personally was subject to an objectively severe, pervasive, and abusive work environment that "alter[ed] the conditions of [her] employment." *Stewart*, 275 F.3d at 1133 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999)).

Finally, even if some of plaintiff's allegations suggest discrete acts of discrimination—such as her allegations of unequal pay, *see supra* Part III.D—they do not demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21. Just as "a hostile work environment claim is not rendered invalid merely because it contains discrete acts that the plaintiff claims . . . are actionable on their own," a discrete discriminatory act does not alone constitute a hostile work environment claim without showing that it was "part of a severe and pervasive pattern of harassment." *Outlaw*, 49 F. Supp. 3d at 92 (alteration in original) (first passage quoting *Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014)). Plaintiff has not demonstrated such a pattern of harassment here.[4]

---

[4] The single case discussed by plaintiff, *Na'im v. Clinton*, 626 F. Supp. 2d 63 (D.D.C. 2009), is far afield from the circumstances here. Pl.'s Opp'n at 29-30. The court there ultimately granted summary judgment to defendants because the plaintiff did not demonstrate the abuse she suffered was on account of her race. *See Na'im*, 626 F. Supp. 2d at 75. Plaintiff insists *Na'im* is relevant because the facts alleged there "were enough to get to the plaintiff to a motion for summary judgment." Pl.'s Opp'n at 30. That the defendant there chose to file a motion for summary judgment rather than first contest the plaintiff's allegations under Rule 12(b)(6) does not, however, indicate that those allegations were necessarily sufficient. *See Na'im*, No. 6-cv-2237 (RMU) (docket for case showing no motion for dismiss filed). In any case, the facts described in the court's summary judgment opinion indicate conditions far more severe than those alleged here. There, a superior had "made highly derogatory comments about [the plaintiff] during the renewal of [her] government security clearance," describing her as "a 'violent individual' who could bring a gun to work and 'go[] postal,'" regularly repeated derogatory comments about her personal appearance, failed to provide timely performance evaluations, and gave plaintiff "unwarranted low performance ratings." *Id.* at 69. Her subsequent supervisor also made comments about her "pathologically loud

26

Plaintiff thus has not stated a claim for hostile work environment, and Counts I, III, and V of her amended complaint are dismissed.

### C.    Plaintiff's Claims of Retaliation under Title VII, § 1981, and DCHRA (Counts II, IV, and VI)

Plaintiff has pled additional claims under Title VII, § 1981, and the DCHRA for retaliation in Counts II, IV, and VI.  Those statutes prohibit retaliation "against employees for opposing an unlawful employment practice."  *Black*, 2023 WL 3055427, at *6 (citing 42 U.S.C. § 2000e-3(a)l with respect to Title VII); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ([Section "1981 encompasse[s] claims of retaliation."); D.C. Code § 2-1402.61 *et seq.*  As with discrimination and hostile work environment claims, the frameworks applying to retaliation claims are the same under all three of these statutes.  *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) ("[T]he frameworks applicable to claims of retaliation under Title VII and § 1981 are 'essentially the same.'" (quoting *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 661 F.3d 1, 6 (D.C. Cir. 2010))); *Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018) (explaining that Title VII and the D.C. Human Rights Act "require[] the same showing").  To demonstrate unlawful retaliation, "a plaintiff must show: (1) that [s]he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against h[er]; and (3) that the employer took the action 'because' the employee opposed the practice."  *Harris*, 791 F.3d at 68 (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)).

The first requirement, a showing of "protected activity," refers to an act by plaintiff constituting "oppos[ition] to an unlawful employment practice."  *Touvian*, 330 F. Supp. 3d at

---

voice" and questioned her "psychological stability."  *Id.*  No such persistent, objectively offensive conduct has been alleged here.

251 (internal quotation marks omitted) (alteration in original) (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). "While no 'magic words' are required, the [employee's] complaint must in some way allege unlawful discrimination." *Broderick*, 437 F.3d at 1232. "[G]eneral complaints about unfair treatment do not" suffice. *Robbins v. Dist. of Columbia*, 67 F. Supp. 3d 141, 146 (D.D.C. 2014), *aff'd*, 650 F. App'x 37 (D.C. Cir. 2016).

Regarding the second element, "a materially adverse employment action," the standard for an adverse action in the retaliation context is somewhat broader than in the discrimination context: "Retaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Baloch*, 550 F.3d at 1198 n.4 (quoting *BNSF*, 548 U.S. at 64, 68). The key question is whether "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *BNSF*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Despite this potentially broader scope of materially adverse employment actions for retaliation claims, the Supreme Court and D.C. Circuit have cabined such actions by taking an "objective" approach to "separate significant from trivial harms." *Chambers*, 35 F.4th at 876-77 (second passage quoting *BNSF*, 548 U.S. at 68)); *McCallum*, 2023 WL 3203011, at *9 n.9, *13 n.14 (explaining that although the D.C. Circuit in *Chambers* held that no objectively tangible harm needed to be shown for adverse employment actions in the context of a discrimination claim, the court there differentiated retaliation claims and "held that retaliation claims still require an 'objectively tangible harm' because "the Supreme Court has concluded that in the retaliation context, 'the standard for judging "material adversity" must be objective, meaning it must be judged from the perspective of a reasonable employee'" (quoting

*Chambers*, F.4th at 876)).  "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)).

As to causation, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  Although mere "temporal proximity—between the protected activity and the adverse employment action"—may be "sufficient evidence of causality," the temporal proximity must be "very close." *Ayo-Aghimien*, 2025 WL 407308, at *8 (last passage quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).  "The plaintiff's burden" at the pleading stage "is not great: [s]he 'need only establish facts adequate to permit an inference of a retaliatory motive.'" *Turner*, 983 F. Supp. 2d at 107 (quoting *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001)).

Plaintiff identifies for her retaliation claims the same alleged adverse actions as for her discrimination claim, *see supra* Part III.A: (1) her removal from the Acting Managing Director position, including the salary reduction; (2) her removal from the steering committee; (3) her negative evaluation; and (4) her constructive discharge.  Pl.'s Opp'n at 20-21.  "For each adverse employment action alleged," plaintiff insists, "including the demotion, [p]laintiff suffered identifiable harm, including lost income, lost opportunities for future career advancement and worsened job prospects." *Id.* at 21.  As defendants argue, none of these incidents constitute a materially adverse employment action that is causally linked to any protected activity to sustain her retaliation claims.  *See* Defs.' Mem. at 29-32.

First, regarding her removal from the Acting Managing Director position, even assuming this action is materially adverse under the standard for a retaliation claim—which does not require an impact on the "terms, conditions, and privileges" of her employment, so the limitation established in *Stewart*, *see supra* Part III.A, for temporary positions would seemingly not apply—she has not demonstrated a causal link to any protected activity.  Her complaint alleges that San Martin removed plaintiff from the role "in retaliation for challenging defendant CEO San Martin's snub of the African American ERG."  FAC ¶ 70.  Yet, plaintiff's comment that not attending the African American ERG "after attending the other ERGs, was a 'bad look'" does not constitute a complaint of "unlawful discrimination" to qualify as protected activity.  FAC ¶ 65.  Plaintiff does not attempt to explain how this comment constituted opposition to a practice that would be unlawful under Title VII.  *See Broderick*, 437 F.3d at 1232 (describing the standard for protected activity); Pl.'s Opp'n at 17; *see also Robbins*, 67 F. Supp. 3d at 146 (noting that a general complaint of "unfair treatment" does not suffice).  Indeed, according to plaintiff's own allegations, San Martin seemingly accepted the comment as constructive advice and acted on the advice by meeting with the African American ERG, as plaintiff recommended. *See* FAC ¶¶ 65-66.[5]  Plaintiff therefore has not adequately pled, but has merely stated in a conclusory manner, that her removal from that position—and the concomitant salary reduction

---

[5]        Moreover, plaintiff also does not allege facts to create the causal link between the opposition to San Martin's initial snubbing of the ERG and San Martin's removal of plaintiff from the acting position.  Plaintiff's complaint does not establish temporal proximity between the two events: Although she alleges that she was removed from her acting position in November 2021, and though San Martin started as CEO in September 2021, plaintiff does not give any date for the snubbing of the ERG or how quickly San Martin resolved that issue by meeting with the ERG.  She merely put the two incidents back-to-back in her complaint.  *See* FAC ¶¶ 63-72.  The order of paragraphs in her complaint cannot make up for her lack of concrete allegations, and an indication only in briefing that the snub of the ERG occurred around October 2021, *see* Pl.'s Opp'n at 22, is simply not a fact alleged in her complaint.  *See* Defs.' Reply at 21 (pointing out the lack of dates in the complaint).

and removal from the Subsidiary Leadership Team—was animated by any retaliatory motive for protected activity.

Second, with respect to the steering committee, plaintiff has not identified any objectively tangible harm for the removal to constitute a materially adverse employment action. She alleged only that the team had "significant implications for business development," so she "no longer played a role in setting priorities" once removed. FAC ¶¶ 122-23. She did not explain how that impacted her work in business development or affected her opportunities for advancement. Even if this removal were a materially adverse employment action, plaintiff cannot draw any causal connection to protected activity. Plaintiff alleges that she was appointed to the committee in September 2022 and "soon thereafter" she was removed "in retaliation for [her] complaints about discrimination at defendant FHI 360, vocal opposition to defendant FHI 360's policies concerning DEI, and advocacy for herself and other Black employees." *Id.* All of those alleged protected activities, however, occurred *before* she was even appointed to the committee in September 2022, which precludes any inference that the *removal* was motivated by those events. *See, e.g.*, FAC ¶¶ 87-88, 90, 97, 100-06, 112; *cf. Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 65 (D.D.C. 1998) (explaining that a benefit to the employee shortly after the protected activity, such as a promotion, undermines "the theory that the defendants' attitude toward [plaintiff] negatively changed as a result of" the protected activity).

Plaintiff's alleged negative evaluation also does not constitute an actionable materially adverse employment action. "[I]n order for a performance evaluation to be materially adverse, it must affect the employee's position, grade level, salary, or promotion opportunities." *King v. Holder*, 950 F. Supp. 2d 164, 173 (D.D.C. 2013) (quoting *Taylor*, 571 F.3d at 1321). As previously explained, *see supra* Part III.A, plaintiff's evaluation with a single comment that she

perceived as negative, does not, as alleged, seem objectively negative at all. Regardless, plaintiff has not alleged any facts indicating how this evaluation had any objective impact on her job or her future prospects. Therefore, the evaluation cannot support a claim for retaliation.

Finally, plaintiff cannot sustain her retaliation claim based on constructive discharge. As previously explained, plaintiff has not adequately alleged that she was constructively discharged nor that she was subject to a hostile work environment, *see supra* Parts III.A.-B. Although such circumstances could be the basis for a retaliation claim, *see Burrell v. Shepard*, 321 F. Supp. 3d 1, 14 (D.D.C. 2018) ("[A] hostile work environment can give rise to a retaliation claim."), if adequately pled, plaintiff has not described circumstances creating the kind of objectively hostile and intolerable environment required to meet the threshold for either a hostile work environment or constructive discharge. As a result, plaintiff's departure cannot be "an adverse employment action attributable to" defendants. *Joyce v. Off. of Architect of Capitol*, 966 F. Supp. 2d 15, 25 (D.D.C. 2013).

Plaintiff does not isolate additional discrete acts that led to her departure as materially adverse employment actions, and indeed, none seems apparent. Defendants' cancellation of check-ins with plaintiff, reducing their interactions, and walling her off from certain decisions, and changing the reporting line for her subordinates, *see supra* Part I.A.9-.10, are certainly inconvenient and unpleasant, but plaintiff has not tied them to any allegations of objective harm. "Such minor 'inconveniences and alteration of job responsibilities [do] not rise to the level of adverse action' necessary to support a claim." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (alteration in original) (quoting *Stewart*, 275 F.3d at 1135); *see also Hayslett v. Perry*, 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (holding that where plaintiff "identified no specific meetings" or "how her alleged exclusion from unspecified meetings had any adverse impact on her

employment terms or conditions or caused any objectively tangible harm," she had not established an adverse action).

Plaintiff has not alleged facts giving rise to a claim of retaliation under any of the three statutes, and Counts II, IV, and VI shall be dismissed.

### D.    Plaintiff's Claims of Pay Discrimination under the Equal Pay Act and the DCHRA (Counts VII and VIII)

Plaintiff asserts in her final two claims that defendant FHI violated the "Equal Pay Act" ("EPA") by "paying female employees less than male employees for work requiring equal skill, effort, and responsibility, performed under similar working conditions," FAC ¶ 190 (Count VII), and committed wage discrimination in violation of the DC Human Rights Act by "paying Plaintiff, a Black female, substantially less than it paid white and/or male employees performing work requiring equal skill, effort, and responsibility because of her race, color, and/or gender," *id.* ¶ 196 (Count VIII).

The EPA provides that "[n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  To state a *prima facie* case under the Equal Pay Act, a plaintiff "must allege that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex." *Watkins v. DOJ*, No. 23-cv-766 (RDM), 2024 WL 4362156, at *10 (D.D.C. Sep. 30, 2024) (quoting *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014)); *see also Corning Glass Works v. Brennan,*

417 U.S. 188, 195 (1974) ("In order to make out a case under the Act, the [plaintiff] must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" (quoting 29 U.S.C. § 206(d)(1)); *Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 815 F.2d 1519, 1522 (D.C. Cir. 1987) (same).[6]  The same standard applies to the DCHRA.  *Newman v. Amazon.com, Inc.*, No. 21-cv-531 (DLF), 2022 WL 971297, at *6 (D.D.C. Mar. 31, 2022). "Once a prima facie case has been made out, the defendant may rebut the showing of equality, or assert one of the Act's affirmative defenses," with "[t]he burden [] on the defendant to prove that unequal payments are made pursuant to some legitimate, non sex-based factor."  *Goodrich*, 815 F.2d at 1523; *see Gaujacq*, 601 F.3d at 575; *Thompson v. Sawyer*, 678 F.2d 257, 271 (D.C. Cir. 1982).

As to the first element, the plaintiff's job and that of the comparator "need not be identical in every respect" but "they must be 'substantially equal.'"  *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 448-49 (D.C. Cir. 1976) (first passage quoting *Corning Glass Works*, 417 U.S. at 203 n.24), *cert. denied,* 434 U.S. 1086 (1978), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988).  "A determination of substantial equality involves

---

[6]    While the D.C. Circuit has not outlined the *prima facie* elements for an EPA claim using the precise tripartite structure as the district court in *Watkins* and *Cornish*, other circuits have done so.  *See, e.g., Rongere v. City of Rockford,* 99 F.4th 1095, 1102 (7th Cir. 2024) ("To demonstrate a prima facie case under the EPA, a plaintiff must establish (1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." (internal quotations and citation omitted)); *Polak v. Va. Dep't of Env't Quality*, 57 F.4th 426, 429-30 (4th Cir. 2023) ("To establish an Equal Pay Act claim, the plaintiff 'must make an initial (*i.e.*, prima facie) showing of three elements: (1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions.'" (alteration in original) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019))); *Dindinger v. Allsteel, Inc.,* 853 F.3d 414, 421-22 (8th Cir. 2017) ("To establish a claim of sex-based wage discrimination under the Equal Pay Act . . ., 'a plaintiff  must show by a preponderance of the evidence that (1) she was paid less than a male employed in the same establishment, (2) for equal work on jobs requiring equal skill, effort, and responsibility, (3) which were performed under similar working conditions.'" (quoting *Hunt v. Neb. Pub. Power Distrib.*, 282 F.3d 1021, 1029 (8th Cir. 2002))).

an inquiry into whether the jobs are substantially related and substantially similar in skill, effort, responsibility and working conditions" with a focus "on the primary duties of each job, not those which are incidental or insubstantial." *Goodrich*, 815 F.2d at 1524. "Furthermore, in comparing two jobs, only the skills actually required by those jobs, not the abilities of the persons currently in those positions are relevant." *Id*. Otherwise, the elements of the *prima faci*e case risk conflation with the affirmative defenses, for which the defendant bears the burden of proof, including, for example, showing that a wage differential was "based on any other factor other than sex," 29 U.S.C. § 206(d)(1), such as poor performance.

Plaintiff raises the issue of unfair pay four times in her Amended Complaint; only one states a claim under the EPA and DCHRA.[7]  First, she alleges that she was "paid below market for her job as Director of Business Development and Diversification, and less than her white peers at Defendant FHI 360.  On information and belief, male and white directors were paid more than Plaintiff for equal work."  FAC ¶ 31.  That recitation of the elements of the cause of action is "conclusory" and "do[es] not suffice" to state a claim.  *Iqbal*, 556 US. at 678.  Plaintiff does not identify any specific comparators or allege any facts indicating that her "peers'" jobs were comparable in any way to hers.  The same holds true even if her oblique reference to "peers" is meant to refer to the jobs of other directors.

Second, plaintiff alleges that she requested a 10% salary increase for her role as Acting Managing Director and was given only a 5% salary increase, which "left [p]laintiff earning

---

[7]    Defendants argue that the first three instances are untimely allegations, given that the EPA has a two-year statute of limitations period, *see* Defs.' Mem. at 36-39, while plaintiff insists that a three-year period applies because defendants willfully violated the EPA, and willful violations are subject to a three-year period, *see* Pl.'s Opp'n at 7-8.  The timeliness of plaintiffs' first three allegations of pay inequality need not be decided, however, because those allegations fail to state a claim regardless, as explained in the text.  Only plaintiff's fourth instance regarding a pay differential with her successor states a claim, and defendants concede that allegation is timely under both the EPA and the DCHRA.  *See* Defs.' Mem. at 14-15, 42.

below market rate and, on information and belief, earning less than her male and white counterparts." FAC ¶ 35. "Plaintiff learned that a male employee was offered an 'acting director' role, similar to Plaintiff's Acting Managing Director role, with a 20% salary increase." *Id.* ¶ 36. Plaintiff's allegations here are, again, insufficient. She does not allege any information about the jobs of "her male and white counterparts," *id.* ¶ 35, and she provides no facts about the new "acting director role" and the extent to which it was similar to hers, *id.* ¶ 36. She thus cannot state a claim under the EPA. Moreover, with respect to the other male "acting director," plaintiff does not even allege that she is paid less than the comparator, given that she only provided relative percentages of salary raises as opposed to absolute figures. Plaintiff could earn substantially more than the other "acting director" in absolute terms, even though she was only given a 5% raise for that role while he was given a 20% raise.

Third, plaintiff alleges that when she was removed from her Acting Managing Director role, her "salary was decreased to what she previously earned while only Director of Business Development and Diversification" and "FHI 360 does not normally decrease employees' salaries after they complete acting roles." FAC ¶ 92. Plaintiff does not allege, however, that she made *less* than any male comparator, and thus plainly fails to state a claim under EPA for that salary decrease.

Plaintiff does state a claim, however, with respect to her allegation that the white man who replaced her upon her resignation—albeit only for three weeks before a different woman took over—was "paid substantially more . . . for the same job." *Id.* ¶ 137. She alleges that although the job was upgraded to a higher title, the job description was not changed. *Id.* Though sparse, these allegations allow for an inference that the male comparator—her successor—

worked a substantially similar job under similar working conditions and was paid more than plaintiff, which states a claim under the EPA.  *See Watkins*, 2024 WL 4362156, at *10.

As an initial matter, defendants do not argue that a successor is an improper comparator. *Cf. Thomas v. Vilsack*, 718 F. Supp 2d 106, 118 (D.D.C. 2010) (assuming that a successor can be a proper comparator although "[t]his Circuit has not explicitly held whether or not a plaintiff can use a successor as a comparator for a pay discrimination claim").  Rather, defendants assert that "[p]laintiff's claims must be dismissed because she provides absolutely nothing to support her allegation that she performed the 'same job,' or that the term 'the same job' is even intended to insinuate that Plaintiff and her successor perform substantially equal work as opposed to merely having the same general position."  Defs.' Mem. at 42; *see also* Defs.' Reply at 25.  To the contrary, the allegation that the successor was hired pursuant to a job description the same as plaintiff's indicates that he performed "the same job," and at this stage, plaintiff need not separately allege that he performed substantially equal work when she has already alleged that they were in substantially equal jobs requiring equal skill, effort, and responsibility.  *See Savignac v. Day* ("*Savignac II*"), 539 F. Supp. 3d 107, 118 (D.D.C. 2021).  Given that in the EPA, the term "equal work" is *defined* by the second statutory phrase "jobs the performance of which requires equal skill, effort, and responsibility," "'[e]qual work' and work on a job requiring 'equal skill, effort, and responsibility . . .' are not two separate requirements."  *Id.* at 113-14.  As a result, "[f]or the purposes of stating a *prima facie* case, . . . the question is not how the employee performed—but, instead, what the job requires."  *Id.* at 112.  In other words, to withstand a motion to dismiss a plaintiff "need only allege that, as a general matter, [the comparator] hold[s] [a] job[] with similar performance requirements," not that "she in fact

performed equally to her comparator[]." *See id.* at 118.  Plaintiff has satisfied that requirement here.

Indeed, in several other cases cited by plaintiff, something as simple as a similar job description or a grouping of jobs in a work study has sufficed to allege that the plaintiff and comparators had similar jobs.  For instance, in *Clay v. Howard University*, 128 F. Supp. 3d 22 (D.D.C. 2015), the plaintiff alleged that a non-immediate successor "was hired to do the same work as [plaintiff] in the position of Senior Benefits Analyst, and was paid significantly more." *Id.* at 31 (quoting the complaint).  The *Clay* court rejected defendants' argument that more facts were necessary to find "that the allegations in the Amended Complaint" were "sufficient to support the inference that [p]laintiff performed equal work for unequal pay." *Id.*  Similarly, in *Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499 (RC), 2019 WL 4601726 (D.D.C. Sep. 23, 2019), the plaintiff provided a "median salary survey for the directors and manager in the Operations department," which indicated she was being underpaid. *Id.* at *9.  Although plaintiff did not allege details about her responsibilities, the salary survey sufficiently indicated "that the jobs being surveyed were at least comparable," allowing for a reasonable inference that she was paid less for a substantially similar job. *Id.*

Defendants further argue that "plaintiff d[id] not plead the amount she was underpaid," so her allegation about unequal pay lacks factual support, Defs.' Reply at 25, but provide no authority for such a requirement to withstand a motion to dismiss.  Although they cite *Baker-Notter* and *Clay* as cases where plaintiffs pled the amount of underpayment, the court in *Clay* appeared to accept a bare allegation that a comparator "was paid significantly more," and in neither case did the court establish a requirement on plaintiffs to give dollar amounts or percentage figures. *Clay* 128 F. Supp. 3d at 31; *see also Baker-Notter*, 2019 WL 4601726.

Moreover, plaintiff's allegation that her successor was given a higher title and level for the same job provides factual support for her statement that her successor was paid more. FAC ¶ 137.

Finally, defendants briefly contest plaintiff's DCHRA wage discrimination claim in Count VIII with respect to the unequal pay of her successor, arguing that plaintiff has not provided "nearly enough details to show how she was similarly situated to this comparator." Defs.' Mem. at 14-15. As support, defendants cite two cases for the principle that plaintiff did not show "there is a comparator nearly identical to Plaintiff in all relevant aspects," *id.* at 15, but neither case is apposite. In the first, *Franks v. Edison Electric Institute*, No. 20-cv-3393, 2022 WL 971157 (D.D.C. Mar. 31, 2022), the court required a showing that "all of the relevant aspects of [plaintiff's] employment situation were nearly identical to those of the other employee" at the *summary judgment stage*; that opinion said nothing about what is required to meet plaintiff's pleading obligation. *Id.* at *5 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)).

The other, *Savignac II*, directly cuts against defendants' argument. *Savignac II* makes clear that plaintiff "need not establish that" her comparators "perform[] identical duties" at the pleading stage, but merely that "where the equivalence is not obvious on the face of the job, the complaint must say something about the" similarity of "'skill, effort, . . . responsibility' and 'working conditions' that define the 'job' at issue." 539 F. Supp. 3d at 118-19 (omission in original). Here, plaintiff alleges that the comparator was her successor and thus took on the same role with the same job description. FAC ¶ 137. She alleges that the title difference was just a change in leveling and not indicative of a different job. *See id.* ¶¶ 136-37. That is enough to draw a reasonable inference in plaintiff's favor that her male comparator worked a similar job and was paid more.

To prevail, plaintiff will eventually have to propound facts regarding "how the employee performed," but her allegations that she and her successor were in the same role with the same responsibilities suffice to state a claim. *Savignac II*, 539 F. Supp. 3d at 112; *see also Baker-Notter*, 2019 WL 4601726, at *9 ("It will take much more detail to prove that all [comparators] did in fact have 'substantially similar' jobs."). Defendants' motion to dismiss Counts VII and VIII are therefore denied.[8]

## IV.    CONCLUSION

For the reasons explained, defendants' motion is granted with respect to Counts I through VI and denied with respect to Counts VII and VIII. Plaintiff has stated a claim under the Equal Pay Act and the DCHRA for wage discrimination but not for race, color, or gender discrimination, hostile work environment, or retaliation under Title VII, § 1981, or the DCHRA.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  September 2, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[8]    Although plaintiff mentions "unequal wage[s]" as part of her allegations of discrimination under Title VII, § 1981, and the DCHRA in Counts I, III, and V of her complaint, *see* FAC ¶¶ 142, 158, 174, the incident of unequal pay compared to her successor is considered here only for her EPA and DCHRA claims in Counts VII and VIII and not evaluated as part of the other claims. Plaintiff does not specifically reference this incident under Counts I, III, and V in her complaint, nor in her briefing on Counts I, III, and V, in discussing adverse employment actions. The allegation is therefore only clearly presented with respect to the EPA and DCHRA claims.